F I L E D
United States Court of Appeals
Tenth Circuit

FEB 10 2004

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

OLEG SVIRIDOV,

        Petitioner,

v.

JOHN ASHCROFT,

        Respondent.

No. 02-9574

---

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS
(BIA No. A75 710 013)

---

Beverly W. Oserow, Denver, Colorado, for Petitioner.

Donald E. Keener, Deputy Director, Office of Immigration Litigation (Peter D. Keisler, Assistant Attorney General; Richard M. Evans, Assistant Director; and Susan K. Houser, Attorney, on the brief), Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

---

Before **EBEL** , **ANDERSON** , and **HARTZ** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

Petitioner Oleg Sviridov is a native and citizen of Russia. He seeks review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision denying his application for asylum, withholding of removal, and relief under the Convention Against Torture. We affirm.

## BACKGROUND

Sviridov entered the United States on June 20, 1997, on a visitor visa with authorization to stay until June 19, 1998. He successfully sought an extension of his departure date to December 19, 1998. Sviridov filed an application for asylum under the Immigration and Nationality Act ("INA") § 208, 8 U.S.C. § 1158, on June 29, 2000. He was placed into immigration proceedings in August 2000 and charged with being subject to removal under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States beyond the date authorized without receiving permission from the Immigration and Naturalization Service ("INS"). [1] He renewed his application for asylum, and also sought withholding of

---

[1]The INS ceased to exist on March 1, 2003, and its functions were transferred to the U.S. Citizenship and Immigration Services ("USCIS") within the newly formed Department of Homeland Security.

removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and relief under the Convention Against Torture. [2]

After conducting a hearing, the IJ denied Sviridov's application for asylum because it was untimely. See 8 U.S.C. § 1158(a)(2)(B), (D) (requiring an asylum petitioner to file within one year of arrival in the United States, absent a showing of changed circumstances "which materially affect the applicant's eligibility for asylum" or extraordinary circumstances excusing the delay). The IJ denied his application for withholding of removal under § 1231(b)(3) because Sviridov had failed to show that "there is a clear probability of persecution due to his race, religion, nationality, membership in a particular social group, or political opinion." Tsevegmid v. Ashcroft, 336 F.3d 1231, 1234 (10th Cir. 2003) (citing INS v. Stevic, 467 U.S. 407, 413, 430 (1984)). The IJ also denied relief under the Convention Against Torture because he found Sviridov failed to establish that "it is more likely than not that he . . . would be tortured if removed to [Russia]." 8 C.F.R. § 208.16(c)(2). Sviridov appealed the IJ's decision to the BIA, which issued a summary affirmance without an opinion, in accordance with 8 C.F.R.

---

[2]The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, was implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-821 (1998). See 8 C.F.R. § 208.16(c)(1), .17. It permits withholding of removal for an alien who establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Id. § 208.16(c)(2).

§ 3.1(e)(4) (now codified at 8 C.F.R. § 1003.1(e)(4) (2003)). Sviridov seeks review of that decision.

Sviridov was born on October 24, 1958, and grew up in Poland and Russia. His father was Russian and his mother is ethnically Jewish, although she is registered as Russian. Sviridov trained to become a marine navigator and worked as a captain's assistant on a ship from 1979 until 1985. He alleges that the FSB (formerly the KGB) questioned him in 1985 about sailors under his command who had jumped ship while his ship was in port in the United States and warned him not to allow such conduct again. He further avers that he also lost his job in 1985 when he refused to join the Communist Party. Sviridov thereafter moved to Krasnodar, Russia, where he worked in construction for two years.

He was able to obtain another seafaring job in 1987, on a ship which conducted geological expeditions. He avers that in late 1995, he was again questioned by the FSB after several crew members jumped ship and defected to the United States. [3] He asserts that the FSB knew about their prior contact with him in 1985, and they allegedly threatened him if he allowed any crew members to jump ship again. Sviridov testified that, following this questioning, he used his accumulated vacation days to take a long leave of absence in the city of

---

[3]He stated in his affidavit that this questioning occurred in October 1995. He testified at his hearing before the IJ that the interrogation occurred in 1994.

Novorosisk, not far from Krasnodar, and when he returned, he was told that he would be fired unless he voluntarily quit his job. He avers that the company told him he was being dismissed for his political beliefs.

Sviridov claims he then traveled to Moscow and filed a request for job reinstatement with the Geological Ministry, the entity which oversaw Sviridov's former company. He alleges that nobody at the Ministry would listen to him. He then returned home to Novorosisk, where he and other current and former employees of the geological company formed a group to protest the company's dismissal of people based upon their political beliefs or ethnic background. He avers the group was "an informal and unregistered group that did not have an official name." Sviridov Aff. at 2, Admin. R. at 189. He further avers the group also opposed the candidacy of the company's president, Mikhail Gromov, for a seat in the Duma, the Russian parliament. Sviridov testified that the group published flyers, spoke to people, and held meetings in the city of Gelendzhik, some twenty miles from Novorosisk, to protest the administration in the Krasnodar region, which the group claimed persecuted minorities.

Sviridov claims that in 1997, based upon his association with this group, he was detained in the street and taken to a police station, where he was warned to stop his protest activities and leave the city. He asserts that on May 1, 1997, he and the group held a meeting in front of the geological company, during which

Sviridov gave a speech accusing Gromov of being a Communist and being corrupt. He admitted in his testimony before the IJ that the group was required to obtain a permit before holding a demonstration, but that they had not obtained a permit prior to the May 1 demonstration. He states that the police broke up the meeting, arrested him and other group members, and detained him for twenty days, during which time he asserts he was beaten on two or three occasions.[4] He says the police interrogated him and told him he had been warned to leave the city and that they knew of his dealings with the FSB. He avers he was placed in a cell with others whom the police knew would beat him. He claims that, following his release, he went to a hospital and received treatment for a concussion and other injuries. He claims that he then returned home to Novorosisk.

Sviridov testified that, following his detention by the police, he and his second wife decided to leave Russia and go to the United States.[5] He testified that when he first came to the United States, he intended to seek asylum. Id. at 102. However, in his asylum application, he explained his failure to file his application within one year of arrival by stating that he "did not plan to remain USA." Id. at 251. He claims he cannot return safely to Russia because Gromov

---

[4]Sviridov testified at his hearing that he was beaten three times. Admin. R. at 111. In his affidavit, he stated that he was beaten twice. Id. at 191.

[5]Sviridov left Russia with his second wife, from whom he is now apparently divorced.

holds a position in the Duma, had held a position on the Geological Ministry committee, and is a personal friend of Konstatin Kondratenko, the governor of the Krasnodar region. He avers that "Gromov has power that extends throughout Russia and Mr. Sviridov is afraid that Gromov could pursue and cause harm to him no matter where he would move in Russia." Pet'r's Opening Br. at 16. He further claims that he would be unable to register to live somewhere else in Russia without first cancelling his current registration, which would necessitate contacting the local authorities whom, he claims, would harm him. He believes that he would be unable to obtain employment in his field because of Gromov's influence over the Geological Ministry committee and the industry in general.

Sviridov claims that after he left Russia, his first wife, who lives in Krasnodar, began receiving phone calls from the police asking for Sviridov's whereabouts, and he avers that his brother sent to him several summons from the police ordering him (Sviridov) to report to police headquarters. He further states that his mother, who remains in Russia, has told him over the phone not to return to Russia.

When asked why he filed his asylum application more than one year after entering the United States, he testified that he was not initially aware of the one-year deadline. Furthermore, he testified that when he began the process of seeking asylum in November 1998, he gave someone $1000 to file his application,

but that person never did so. He then contacted a woman in Los Angeles in February 1999, who required $4000 to file his application. He avers it took him some length of time to amass the $4000 fee. The woman finally filed his application in June 2000.

Sviridov argues (1) the BIA improperly issued a decision without opinion by a single Board member, in violation of 8 C.F.R. § 3.1(a)(7) and (e)(4); (2) the BIA violated Sviridov's due process rights by issuing a decision without opinion which failed to explain its reasons for upholding the IJ's decision; (3) the IJ made clearly erroneous factual findings concerning Sviridov's testimony; (4) the IJ erred in finding Sviridov was not credible; (5) the IJ erred in finding Sviridov had "shown no basis why he would be targeted for harm by the authorities"; and (6) the IJ erred as a matter of fact and law in finding that Sviridov had failed to establish eligibility for withholding of removal under 8 U.S.C. § 1231(b)(3) and relief under the Convention Against Torture, 8 C.F.R. § 208.16. Pet'r's Opening Br. at 40. At oral argument, Sviridov's counsel argued for the first time that, based upon her interpretation of a recent First Circuit decision, Haoud v. Ashcroft, 350 F.3d 201 (1st Cir. 2003), we should remand this case to the BIA for clarification of the reasons why it affirmed the IJ's decision. Sviridov has also filed, subsequent to oral argument, a motion for a stay of voluntary departure

pending disposition of this appeal. We deny his petition and affirm the BIA's

decision. We also deny his motion for a stay of voluntary departure.


**DISCUSSION**

## I. BIA Decision

Sviridov first argues the BIA failed to comply with its own regulations in

issuing the decision without an opinion by a single Board member. INS (now

USCIS) regulations provide that cases on appeal from IJ decisions are initially

screened under 8 C.F.R. § 3.1(e). Each case is assigned to a single member of the

BIA unless, pursuant to § 3.1(e)(6), the case meets the criteria for assignment to a

three-member panel of the BIA.

If assigned to a single Board member, that member affirms the IJ's decision

without issuing an opinion "if the Board member determines that the result

reached in the decision under review was correct[,] that any errors in the decision

under review were harmless or nonmaterial," and that either existing precedent

controls the decision, or the issues involved "are not so substantial that the case

warrants the issuance of a written opinion." 8 C.F.R. § 3.1(e)(4)(i) (now codified

at 8 C.F.R. § 1003.1(e)(4)). The regulation further states that the IJ's decision

becomes the "final agency determination," 8 C.F.R. § 3.1(e)(4)(ii), and that the

Board member's summary affirmance "shall not include further explanation or

reasoning" and only "approves the result reached in the decision below." Id. The BIA in this case invoked this regulation in summarily affirming without an opinion the IJ's decision.

Sviridov argues the Board member erred in employing § 3.1(e)(4) because "the result reached in the IJ's decision was not correct, the errors in the decision were not harmless and nonmaterial, and the factual and legal questions raised on appeal are not so insubstantial that three-member review was not warranted." Pet'r's Opening Br. at 21. [6] As explained more fully below in our review of the IJ's decision, we disagree with Sviridov's argument, and hold that the Board member properly affirmed the IJ's decision under § 3.1(e)(4).

## II. Due Process

Sviridov argues the use of § 3.1(e)(4) to affirm the IJ's decision violates his due process rights. We have recently rejected this challenge to the summary affirmance procedure contained in § 3.1(a)(7), which is identical to § 3.1(e)(4). See Yuk v. Ashcroft, No. 02-9546, 2004 WL 79095, at *9 (10th Cir. Jan. 20, 2004); see also Batalova v. Ashcroft, No. 02-9588, 2004 WL 103555, at *6 (10th

---

[6]Sviridov argues that the BIA failed to comply with 8 C.F.R. § 3.1(a)(7), which contains language identical to § 3.1(e)(4). It is clear from the BIA's decision in this case that the Board member invoked § 3.1(e)(4).

-10-

Cir. Jan. 23, 2004) (rejecting a due process challenge to summary affirmance under § 3.1(e)(5)). Sviridov's due process argument therefore fails.

### III. IJ's Decision

By summarily affirming the IJ's decision without an opinion, pursuant to 8 C.F.R. § 3.1(e)(4), the BIA made the IJ's decision the final agency determination for purposes of appellate review. Sviridov argues the IJ made various factual and legal errors in denying his application.

"The [IJ's] findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." Yuk, 2004 WL 79095, at *10 (further quotation omitted); see 8 U.S.C. § 1252(b)(4)(B). Put another way, we review the IJ's decision under the substantial evidence standard. We therefore uphold it if "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). We do not "weigh the evidence or . . . evaluate the witnesses' credibility." Woldemeskel v. INS, 257 F.3d 1185, 1189 (10th Cir. 2001) (further quotation omitted). However, the credibility determinations must be "substantially reasonable." Id. at 1192. Because an alien's testimony alone may support an application for withholding of removal or asylum, 8 C.F.R.

§ 208.13(a), the IJ must give "specific, cogent reasons" for disbelieving it.       See

Secaida-Rosales v. INS  , 331 F.3d 297, 307 (2d Cir. 2003) (further quotation

omitted).


### A.  Testimony and documents

Sviridov argues the IJ made various clearly erroneous factual

determinations concerning Sviridov's testimony and the documents he submitted

in support of his application.  In support of his claim that he was severely beaten

by the police when he was detained for twenty days in May 1997, Sviridov

submitted a medical certificate which stated that Sviridov had been diagnosed

with a "brain concussion of the II degree, numerous injuries, bleeding."  Admin.

R. at 264.  He also presented copies of the two summonses he claims he

eventually received, which directed him to appear before the "militsia

department."   Id. at 233-35.  The IJ found as follows concerning those documents:

> [T]he medical certificate and the summonses . . . seem unreliable to
> this Court.  Those documents were not authenticated as permitted
> under 8 C.F.R. § 287.6.  The Court has no way of knowing whether
> these documents are authentic.  There are no recognizable indicia of
> authenticity on those documents, which the Court can point to.
>     The respondent indicated that the medical certificate had been
> issued in order to cover all three incidences in which he had been
> arrested, this seems very unlikely.  The summonses were addressed to
> the respondent's ex-wife.  The respondent was divorced in 1983 and
> the summonses were issued more than 15 years after that date.  It
> seems extremely unlikely that they would have been issued and

-12-

addressed to the respondent at an address which apparently he had not lived at for 15 years.

The respondent claims that his "propiska" still shows him residing at the same address with his ex-wife. However, I would note that the respondent was involved in a maritime business. He received authorization and passports from the government relating to his status as a seaman. It would seem that his identity and whereabouts could be easily discerned by any interested authorities.

The fact that the authorities would not make a reasonable effort to find out his actual whereabouts, points out the lack of interest which the authorities would have in the actual locating of the respondent. The Court finds that the documents not only are unreliable, but in and of themselves, they don't support the grant of relief which the respondent requests.

Oral Decision of the IJ at 11-12, Admin. R. at 52-53.

Given our deferential standard of review, we conclude that the IJ's determination that the records in question were not reliable and did not support Sviridov's claims is supported by substantial evidence and is substantially reasonable. [7]

Sviridov also argues the IJ mischaracterized his testimony concerning the group to which he belonged. The IJ stated he "is concerned that the respondent indicated that this organization has no name and when questioned about its

_____

[7]Aside from lacking clear indicia of authentication, one copy of the medical certificate translation contained in the administrative record contains the date "October 20, 1997," some five months after the alleged beatings took place. The month "October" is crossed out and "May" is handwritten over it, with the additional handwritten note, "translator error." Admin. R. at 264. Another copy of the certificate at another place in the administrative record contains the date "October 20, 1997" without any additional notation. Id. at 228.

-13-

political theories, the respondent gave only a general description of its goals and its philosophies." Id. at 51. The IJ accurately described Sviridov's testimony on this point. Sviridov testified that the purpose of the group was to "speak against [Gromov]," and against "Governor Konstantin [Kondratenko] which was against our beliefs." Id. at 123. When asked what his beliefs were, Sviridov responded that he was simply against the "actions of" Kondratenko and Gromov, because Gromov "constantly lied" and "cheated," because he "promised the employees of the company to pay their salaries at times and promised to give everybody employment," and because "many people, minorities, such as Armenians and Jews who worked for the company, were fired." Id. at 123-24. The IJ's factual findings have substantial support in the record.

### B. Credibility determinations

The IJ found Sviridov's testimony not credible on various points. We will not disturb those factual findings provided they are substantially reasonable and supported by specific, cogent reasons. The IJ found Sviridov's claim that he was completely unaware of the existence of labor unions, and that there were no such unions in Russia, "incredible" in view of information in the State Department Country Report for Russia indicating the existence of labor unions. The IJ drew the inference from Sviridov's unawareness that he "has not made even a minimal

-14-

effort to research the available resources for opposing the alleged oppression of his company." Oral Decision at 10, Admin. R. at 51. Thus, the IJ reasonably concluded that Sviridov's claim that he organized and directed a worker's protest group which voiced concerns about his former company's general personnel policies, as opposed to simply complaints about having been fired, was not credible.

The IJ also found that Sviridov:

apparently had no political activity prior to the age of 38 years old. Although it is possible for him to generate political opinions at that age, it does seem unlikely that they would spring full blown the way the respondent claimed they have, and it also seems very unlikely that the respondent would have had the ability to generate the attendance that he claims at a demonstration, which he claims was based on political ideas.

Id. at 51-52. That is an adequate explanation of why the IJ doubted Sviridov's claim that his creation and participation in the group was motivated by political beliefs rather than a simple labor dispute with his former company.

### C. Adequacy of Sviridov's showing of future harm

Sviridov argues the IJ erred in finding that he had shown no basis why he would be targeted for harm. Sviridov repeats here his claim that he had adequately demonstrated that he held "political opinions" which put him at odds with Gromov, who would persecute him should he return to Russia. As explained

above, when asked about his political views and those of the group to which he belonged, Sviridov could only respond in vague generalities, which were equally indicative of mere disgruntlement with having been fired from his job. We cannot say that the IJ's conclusion that Sviridov failed to show that he was in danger because of his political views is "contrary to what a reasonable factfinder would have been compelled to conclude." Vatulev v. Ashcroft, No. 02-9573, 2003 WL 23098615, at *3 (10th Cir. Dec. 31, 2003).

### D. Eligibility for withholding of removal and relief under the Convention Against Torture

An applicant seeking withholding of removal bears the burden of showing "a clear probability of persecution attributable to race, religion, nationality, membership in a particular social group, or political opinion." Tsevegmid, 336 F.3d at 1235 (further quotation omitted). Relief under the Convention Against Torture requires a showing that it is more likely than not that Sviridov would be tortured if returned to Russia. Having reviewed the entire record, we conclude that substantial evidence supports the IJ's determination that Sviridov failed to show a clear probability of persecution based upon his political views and activities. Substantial evidence also supports the IJ's decision denying Sviridov relief under the Convention Against Torture.

## IV.  Haoud  Decision

Sviridov has belatedly raised an argument concerning his asylum claim based upon the recent First Circuit decision in Haoud .  Sviridov's application for asylum was untimely.  The IJ rejected his claim for asylum because of that untimeliness and because Sviridov failed to show "extraordinary circumstances" excusing the untimely application, pursuant to 8 U.S.C. § 1158(a)(2)(D).  We and numerous other circuits have held that, although we generally have jurisdiction to review the denial of an asylum request,  we lack jurisdiction to review a determination on the timeliness of an asylum application:

> Section 1158(a)(3) expressly provides that the courts do not have "jurisdiction to review any determination" on whether the alien filed his application within a year of entry or whether "changed circumstances" exist "which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."

Tsevegmid , 336 F.3d at 1235 (quoting 8 U.S.C. § 1158(a)(3)).

Sivirdov argues, citing Haoud, that because the BIA member summarily affirmed the IJ's decision without an opinion or explanation of its reasons, we cannot tell whether the BIA affirmed on an unreviewable basis (untimeliness) or on a reviewable basis (the merits of his asylum application).  If in fact the BIA affirmed on a reviewable basis, Sviridov would be deprived of that review if we conclude that the existence of an additional, unreviewable basis deprives us of jurisdiction.

-17-

In Haoud, the applicant filed an untimely petition for asylum. The IJ denied his application, finding that the applicant "failed to establish changed circumstances to excuse that untimeliness." Haoud, 350 F.3d at 203. The IJ also, however, held in the alternative that "Haoud's application failed to demonstrate either past persecution or a well-founded fear of future persecution based on a reasonable possibility that he would suffer harm in Algeria." Id. Shortly after the IJ rendered his decision denying Haoud's asylum application, the BIA decided another case, In re Amine Touarsi, A78-161-736 (BIA Dec. 28, 2000), involving a man in essentially the identical situation as Haoud. "Although the IJ denied Touarsi's asylum application, the Board on appeal reversed upon concluding that Touarsi had 'a well-founded fear of persecution in Algeria based on imputed political opinion.'" Haoud, 350 F.3d at 204.

The First Circuit first observed that the affirmance without opinion of the IJ decision in that situation "gives us no guidance as to whether the Board affirmed the IJ's decision on a non-reviewable basis, i.e. untimeliness, or a reviewable basis, i.e. the merits of Haoud's asylum claim." Id. at 206. After noting that when the BIA affirms without opinion or explanation, "'a Court of Appeals must then review the decision of the IJ,'" id. at 207 (quoting Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003)), the court went on to state that that "approach is inapposite here because the IJ never had the opportunity to consider

-18-

Touarsi, which was rendered following the IJ's decision." Id. Thus, the court concluded that "[a]s Touarsi bears strongly on Haoud's asylum application, an AWO affirming an IJ's decision that never considered Touarsi fails to meet th[e] mandate [that the Board give a reasoned administrative decision]." Id. at 208.

Our case is distinguishable from Haoud. First, the IJ in this case did not rule in the alternative on the merits of Sviridov's asylum claim. Rather, the IJ clearly denied the asylum application because it was untimely and Sviridov failed to show extraordinary circumstances excusing that untimeliness. The IJ plainly did *not* reach the merits of the asylum application. Second, as the First Circuit acknowledged, when the Board affirms without an opinion pursuant to 8 C.F.R. § 3.1(e)(4), as it did here, the IJ's decision becomes the final agency decision and that is what we review. See Yuk, 2004 WL 79095, at **7-8. There is no reason in this case, as there may have been in Haoud, that such review is "inapposite."

Accordingly, looking directly at the IJ's decision, the IJ clearly denied Sviridov's asylum application on the exclusive ground of untimeliness. We have no jurisdiction to review that decision. We do not hold that there could never be a situation where a summary affirmance might leave us in doubt as to whether the agency's decision was on a reviewable or an unreviewable basis. That is not the situation, however, on the particular facts of this case.

## V. Stay of Voluntary Departure

Finally, Sviridov has moved for a stay of voluntary departure. When the BIA, on October 17, 2002, affirmed the IJ's decision denying Sviridov's application for asylum, withholding of removal and relief under the Convention Against Torture, the Board granted Sviridov permission to voluntarily depart the United States "within 30 days from the date of this order or any extension beyond that time as may be granted by the district director [of the INS]." Order, Admin. R. at 2. No extension was granted. The period of time for Sviridov to voluntarily depart has, therefore, long ago expired.

Sviridov moves for "a stay of voluntary departure *nunc pro tunc* to the date of this motion, which stay shall not expire until the issuance of the final mandate in this petition for review." Pet'r's Mot. for Nunc Pro Tunc Stay of Voluntary Departure at 1. We decline to do so. He gives no explanation for failing to file his motion earlier, and cites no binding authority permitting a *nunc pro tunc* order

in these circumstances. [8] We are not aware of any such authority. As we have stated:

> The Latin phrase [ *nunc pro tunc* ] is merely descriptive of the inherent power of the court to make its records speak the truth—to record that which was actually done, but omitted to be recorded. It is no warrant for the entry of an order to record that which was omitted to be done. There was no authority for a nunc pro tunc order to show the timely filing of a claim which was not in fact timely.

 W.F. Sebel Co. v. Hessee (In re Fractman)    , 214 F.2d 459, 462 (10th Cir. 1954) (citation omitted).

## CONCLUSION

For the foregoing reasons, we deny the petition for review and affirm the BIA and IJ's decision denying Sviridov withholding of removal and relief under the Convention Against Torture. We deny his motion for a stay of voluntary removal.

---

[8]He relies on two recent cases from other circuits, El Himri v. Ashcroft, 344 F.3d 1261 (9th Cir. 2003), and Nwakanma v. Ashcroft, 352 F.3d 325 (6th Cir. 2003) to argue we have the equitable power to grant such a stay. In both those cases, the applicant filed a motion for a stay of voluntary departure before the period for voluntary departure had expired. See El Himri, 344 F.3d at 1263 n.2; Nwakanma, 352 F.3d at 327. Indeed, the Ninth Circuit expressly stated it did "not decide the issue of whether this court may stay the voluntary departure time period if the motion for stay of voluntary departure is filed after expiration of the voluntary departure time period." El Himri, 344 F.3d at 1263 n.2.