**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 23 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MOGES AEMRO BITEW,

Petitioner,

v.

JOHN ASHCROFT, United States
Attorney General,

Respondent.

No. 03-9583
(BIA No. A79-512-848)
(Petition for Review)

---

**ORDER AND JUDGMENT** *

---

Before **LUCERO** , **McKAY** , and **PORFILIO** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

\* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner seeks review of a decision of the Board of Immigration Appeals (BIA) dismissing his appeal from the denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture.[1] We exercise jurisdiction under 8 U.S.C. § 1252(a), and we deny the petition for review.

Petitioner is a native and citizen of Ethiopia. He admitted that he overstayed his visa to remain in the United States, but he then requested asylum by claiming that he was a member of the Ethiopian Democratic Union Party (alternately the EDU or EDUP), a group that is persecuted by the ruling party of Ethiopia. Petitioner's application for asylum was denied. Petitioner appealed, and was granted a hearing before an immigration judge (IJ) in April 2002. Petitioner was the sole witness in that proceeding.

According to petitioner's testimony, in December 1998, he was ordered to report for civilian guard duty where he lived in Tigray, Ethiopia.[2] R. at 67-68, 72, 90. He did not report as ordered, and he knew that he was taking a "risk" by

---

[1]     The formal name of the Convention Against Torture is the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85. The United States became a party to the Convention Against Torture through the Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105- 277, § 2242, 112 Stat. 2681 (1998). *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 n.8 (10th Cir. 2004) (citing *Batalova v. Ashcroft*, 355 F.3d 1246, 1248 n.2 (10th Cir. 2004)).

[2]     Because this is the spelling of "Tigre" that was in the transcript of petitioner's hearing, we maintain the same spelling here. *See* R. at 67.

refusing his assignment. *Id.* at 108. In March of 1999, petitioner received letters ordering him to report to the kebele, or civilian control system. [3] *Id.* at 69-70. Petitioner's testimony was not entirely clear here, but he related that, although his father paid a "bond" to keep him out of jail, petitioner failed to report for guard duty a second time, and he was arrested. [4] *Id.* at 69-72. He served a prison term of three months. *Id.* at 73. Petitioner asserted that he was beaten while in prison, and that authorities suspected him of involvement with the EDU. *Id.* at 70-71, 74-75.

---

[3] *See generally* U.S. Citizenship and Immigration Servs., *Ethiopia: Information on Kebelle (Kebele) Control of the Population in Ethiopia; and Freedom to Travel for Ethiopians of Eritrean Origin or Heritage* (posted January 10, 2001), http://uscis.gov/graphics/services/asylum/ric/documentation/ETH01003.htm (last modified February 27, 2003) (describing the kebele system of civilian social control in Ethiopia).

[4] The testimony in the record is not entirely clear, and this is one attempt to make sense of petitioner's narrative. The IJ's decision described this same period of time in petitioner's testimony this way:

> In March of 1999, the respondent received a letter indicating that he was to report to the kebele. The testimony was a little vague on exactly what happened afterwards, whether he reported as required or was arrested a day later, but in any event, it does appear that the respondent was then arrested . . . He testified at his arrest, the authorities expressed dissatisfaction with the respondent's activities particularly his underground meetings. The respondent had [the] bond posted for him and he was released on June 20 of 1999.

Aplt. App. at 40.

Then, in November 1999, soon after serving his prison sentence, petitioner received permission from the kebele to move to Addis Ababa, and he was offered the opportunity to work as a household employee for a member of the Ethiopian Embassy staff stationed in Vienna, Austria. *Id.* at 78-79. When petitioner moved to Addis Ababa, the kebele sent him a letter warning him not to participate in anti-revolutionary activities, but the Ethiopian government issued him a visa for travel to Europe. *Id.* at 77-78, 79.

Petitioner worked in Vienna for a year, took a trip with the diplomat to Finland, and never attempted to contact a foreign country about asylum during that time. *Id.* at 101-02, 104. The Ethiopian government renewed his passport while he was in Vienna. *Id.* at 100-01. But, according to petitioner, at the end of the year, when his employer discovered that petitioner was still communicating with the EDU, petitioner feared that he would lose his job or be arrested and returned to Ethiopia. *Id.* at 80-81. Petitioner flew to the United States, and he overstayed his visa. *Id.* at 50, 81. On cross-examination, petitioner admitted that the kebele had never contacted his parents in Ethiopia, nor had the kebele sent his parents or anyone else written documentation warning petitioner not to return to Ethiopia. *Id.* at 105.

In his decision, the IJ found that it was more likely that petitioner had been imprisoned for the crime of not reporting for guard duty in Ethiopia than for his

minimal level of political involvement. *Id.* at 42. Although petitioner introduced a letter from his cousin to support his assertion that he was a member of the EDU and he had an EDU identity card, petitioner acknowledged that he held no leadership position in that organization; his involvement with the EDU had consisted mainly of attending meetings and secretly distributing pamphlets. *Id.* at 41-42; *accord id.* at 91. The IJ documented that the Department of State profile of Ethiopia confirms that "mere membership in or sympathy for a political party . . . is not sufficient grounds for prosecution in Ethiopia." *Id.* at 42 (citing Ex. 7 at 9). Additionally, although petitioner received a notice from the kebele when he moved to Addis Ababa accusing him of not performing his civilian guard duties because "you have an association with anti revolatioaries [sic] and that is why you were not willing to do public service . . . ." R. at 187, the IJ noted that the government of Ethiopia had subsequently granted petitioner a visa to leave the country, and that he had been rewarded through plum employment with a diplomatic officer in Vienna. *Id.* at 42-43. And it was significant to the IJ that petitioner's passport had been renewed while petitioner served abroad. *Id.* at 43.

In conclusion, the IJ found that petitioner's recitation of events showed that he was "not in any kind of permanent danger from the government of Ethiopia." *Id.* at 43. Petitioner's testimony, particularly his assertion that any of his political

activity was first discovered by his diplomatic employer after a year despite petitioner's jail sentence was "just not believable." *Id.*

The IJ denied petitioner asylum, and withholding of removal and relief under the Convention Against Torture, but he granted voluntary departure back to Ethiopia. *Id.* at 43-45. The BIA summarily affirmed the IJ's decision without opinion. *Id.* at 2.

In his petition for review before us, petitioner asserts that the BIA erred in denying him asylum because he had presented enough evidence to have convinced the IJ that he suffered political persecution. *See, e.g.*, Aplt. Br. at i. In particular, petitioner argues that it should have been sufficient evidence of political persecution to present (i) a letter from the chairman of the kebele charging him with having an association with the anti-revolutionaries, (ii) his own testimony that he characterizes without elaboration as consistent, detailed, and coherent, (iii) general media reports about the human rights situation in Ethiopia, and (iv) a public U.S. State Department report documenting that human rights abuses exist in Ethiopia. *See id.* But we disagree.

When the BIA summarily affirms an IJ, we review the IJ's decision as if it were the BIA's. *Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1235 (10th Cir. 2003). We do not weigh the evidence, nor do we evaluate the credibility of witnesses. *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004) (citing *Woldemeskel v. INS*,

257 F.3d 1185, 1189 (10th Cir. 2001)). In addition, the BIA's factual findings "are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Tsevegmid*, 336 F.3d at 1235 (quotation omitted). The IJ must give "specific, cogent reasons" for a determination that petitioner lacks credibility. *Sviridov v. Ashcroft*, 358 F.3d 722, 727 (10th Cir. 2004).

We hold that the record in this case does not demonstrate that "any reasonable adjudicator would be compelled to conclude" that petitioner was persecuted for his political activities rather than for his disobedience of civil law. *Tsevegmid*, 336 F.3d at 1235. Petitioner admits that failure to report for guard duty is a civil offense in Ethiopia punishable by a prison sentence. R. at 108. He admits that his participation in political activities was confined to attending meetings, to writing letters, and to distributing letters and pamphlets secretly. *Id.* at 91-92. And there were problems with how each of the four pieces of evidence that petitioner submitted might support his case. First, the letter from the kebele accusing petitioner of association with anti-revolutionaries insinuates that petitioner's alleged association with anti-revolutionaries was a possible explanation for why petitioner failed to report for guard duty. But this letter from the kebele does nothing to dispute that petitioner was first and foremost punished for failing to report for guard duty as ordered. And petitioner makes no argument

that his failure to report for guard duty was politically motivated. Second, petitioner's testimony about why he would fear political persecution is neither consistent, detailed, nor coherent. His testimony is instead riddled with so much ambiguity that no one involved in this case could agree on the facts—both of the parties and the IJ have divergent, and completely reasonable, interpretations of the same transcript. Finally, media reports and the U.S. State Department document discuss the general situation in Ethiopia, but shed no light on the validity of petitioner's particular assertions.

Moreover, the IJ gave "specific, cogent reasons" why he found petitioner's testimony not to be credible. *Sviridov*, 358 F.3d at 727. The IJ explained that petitioner was most likely jailed for the simple reason that he shirked his civil responsibility to report for guard duty; once this premise is established, petitioner's alternative explanation that he was imprisoned for being a member of the EDU could not be "reliable or believable." R. at 42. The IJ's conclusion that petitioner was not persecuted because of his political activities was bolstered by notice of the preferential treatment that petitioner received after his imprisonment in the form of permission to travel to Austria, and his ability to hold a plum position in the employment of a diplomat there. *Id.* at 43.

Because no reasonable adjudicator would be compelled to conclude that petitioner was persecuted for his political activities, and the IJ found as a factual

-8-

matter that petitioner's testimony was not credible, *see Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004), we accept the agency's findings as conclusive. 8 U.S.C. § 1252(b)(4)(B). We DENY the petition for review.

Entered for the Court

John C. Porfilio
Circuit Judge