F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**January 24, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

HEYDER OTERO; MONICA
BONILLA,

Petitioners,

v.

ALBERTO R. GONZALES,

Respondent.

No. 04-9610
(No. A95-225-044)
(Petition for Review)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH, PORFILIO**, and **BALDOCK**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

[*]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner Heyder Otero and his wife, Monica Bonilla, seek review pro se of a final order of removal issued by the Bureau of Immigration Appeals (BIA).[1] The BIA determined that petitioner's application for asylum was untimely and that he had failed to show "extraordinary circumstances" relating to the delay that would excuse the late filing of his application. It further determined that petitioner had failed to meet his burden of proof concerning his applications for restriction on removal and for protection under the Convention Against Torture.[2] We dismiss in part for lack of jurisdiction, and affirm in part.

Petitioner is a native and citizen of Columbia who was admitted to the United States on or about March 21, 2000, as a non-immigrant visitor authorized to remain in this country until September 20, 2000. His wife, also a native and citizen of Columbia, was admitted to the United States as a non-immigrant visitor on or about April 19, 2000, with authorization to remain in this country until October 18, 2000. Both petitioner and his wife overstayed their visitor visas.

---

[1]  Ms. Bonilla was a derivative applicant of her husband's claims for relief and protection.

[2]  Prior to the amendments to the Immigration and Nationality Act made by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), "restriction on removal" was known as "withholding of removal." *Wiransane v. Ashcroft* , 366 F.3d 889, 892 n.1 (10th Cir. 2004). Although the BIA referred in its decision to "withholding of removal," since this claim was filed after IIRIRA's effective date, we will use the term "restriction on removal."

During a hearing before an immigration judge (IJ) they conceded their removability from this country.

Petitioner filed his asylum application in December 2001, more than a year after his last entry into this country. The BIA denied his application as untimely. An applicant must ordinarily file his application for asylum within one year of his last entry into this country, unless he can show changed circumstances or extraordinary circumstances relating to the delay. *See* 8 U.S.C. § 1158(a)(2)(B). Petitioner argued before the IJ and the BIA that extraordinary circumstances justified the delay in filing his application. Both the IJ and the BIA rejected this claim. We lack jurisdiction to review the agency's decision that petitioner's application was untimely and that extraordinary circumstances did not excuse the untimely filing. *See, e.g., Sviridov v. Ashcroft*, 358 F.3d 722, 730-31 (10th Cir. 2004); 8 U.S.C. § 1158(a)(3). We therefore dismiss petitioner's petition for review to the extent it seeks review of the denial of his request for asylum as untimely.

We retain jurisdiction to consider petitioner's application for restriction on removal and for relief under the Convention Against Torture. To obtain restriction on removal relief, petitioner must show "a clear probability of persecution attributable to race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at 729 (quotation omitted). "Relief under

the Convention Against Torture requires a showing that it is more likely than not that [petitioner] would be tortured if returned to [Columbia]." *Id.* We review the BIA's factual findings for substantial evidence in the record. *See Rivera-Jimenez v. INS*, 214 F.3d 1213, 1216 (10th Cir. 2000). The BIA's findings of fact are conclusive unless the record demonstrates that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Our role is not to re-weigh the evidence or to evaluate witness credibility. *Sviridov*, 358 F.3d at 727.

Petitioner testified that he was a district leader in the Mormon Church in Columbia. He was involved with a social group founded by members of the church that provided assistance to the poor in the city of Olevo. He also participated in a political group called FIS, or Integral Social Force. Petitioner was in charge of creating and distributing a publicity pamphlet for FIS.

In the middle of 1999, as petitioner was posting signs and distributing pamphlets in Olevo, he and two other volunteers were surrounded by a group of persons who identified themselves as members of the Revolutionary Armed Forces of Columbia ("FARC"), a communist group. The FARC members demanded their identification papers. When petitioner and the other volunteers refused, one of the men pulled a weapon, put it to petitioner's stomach, and

threatened to kill him. Petitioner complied, and the men wrote down his personal information in a notebook.

The FARC members told petitioner they knew that he and his companions were members of a "gringo church." Admin. R. at 122. They accused him of "selling our country." *Id.* They struck petitioner and told him and the others that they did not want to see them again. Petitioner claimed that he reported this attack to his bishop, and withdrew from his political activities. He did not report the attack to Columbian police or to any human rights groups.

Petitioner testified that he was accosted a second time in Olevo a month later, when he and three other church members attempted to distribute charitable donations. This time, they were surrounded by a much larger group of FARC members and told not to "distribute this kind of stupid things." *Id.* The FARC members struck petitioner on his face, causing him to fall to the ground, and kicked him. His right eye and lip were injured and he was bleeding from his nose. The FARC members stole the donations and left. Petitioner did not report this attack to police or to the church, but he did report it to the charitable organization.

Subsequent to the second attack, petitioner received a number of threatening telephone calls from FARC. The calls continued, even though he changed his telephone number.

Petitioner testified that he was attacked a third and final time about six months later, in early 2000. He claimed that two people followed him to his house and shot at him, saying "you're going to die today Mormon." *Id.* at 125. His neighbors called the police, who came to his house. Petitioner did not file a report with the police, however, because he believed it would be futile. He stated that his father-in-law, who was a policeman, had advised him not to report such incidents to the police.

The BIA found a number of implausibilities in petitioner's story. It noted that while in Columbia, petitioner spoke to his political leader and to his bishop about the alleged threats and attacks. He did not report the problems to anyone else in his church, however, while in Columbia or upon his arrival in Utah, the world headquarters of the Mormon Church. Nor did he report the threats and attacks to the police or to any human rights organization. While the church learned of the September attack, it did not report it to anyone else.

As the BIA noted, petitioner submitted two letters from his bishop in support of his application, which were dated after his arrival in this country. The first letter says nothing about the incidents petitioner described, even though petitioner testified that he had discussed these incidents with the bishop while they were both still in Columbia. In the second letter, the bishop states that after he departed from Columbia and came to this country, due to his own fear of

persecution, he left instructions with his relatives not to disclose any information as to his whereabouts. The letter goes on to say that after he "found out that [petitioner and his wife] were having similar problems . . . I allowed them to contact me." *Id.* at 235. Yet, if petitioner had told the bishop about these "similar problems" with persecution while they were both still in Columbia, the bishop could not have just "found out" about them after his arrival in the United States. The letters cannot be squared with petitioner's testimony at the hearing.

Petitioner also provided a letter from his political leader in Columbia, who petitioner characterized as one of his best friends in the church, and with whom he had allegedly discussed the threats he received. This letter states nothing about petitioner being persecuted in Columbia.

In sum, substantial evidence supports the BIA's determination that petitioner failed to substantiate his allegations of a clear probability of persecution in Columbia. We are not compelled to reverse the BIA's factual findings concerning petitioner's credibility. We further agree with the BIA that petitioner did not establish the requisite likelihood that he will be tortured in Columbia "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). We therefore DISMISS his petition for review in part for lack of appellate jurisdiction, and AFFIRM in part.

Entered for the Court


John C. Porfilio
Circuit Judge