**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 17 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

MAHMOUD SHEIK ELZOUR,

      Petitioner,

v.

JOHN ASHCROFT, Attorney General,

      Respondent.

No. 04-9507

---

**Petition for Review of a Decision of the**
**Board of Immigration Appeals**
**(BIA No. A78-602-705)**

---

William Michael Sharma-Crawford, Overland Park, Kansas, for Petitioner.

John M. McAdams, Jr., United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C. (Peter D. Keisler, Assistant Attorney General, Washington, D.C., and Linda S. Wernery, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., with him on the brief) for Respondent.

---

Before **EBEL**, **HENRY** and **HARTZ**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

      Petitioner Mahmoud Sheik Elzour ("Petitioner"), a Syrian national, entered

the United States without authorization in April 2000. The government now seeks

to remove him from the country. In response, Petitioner claims that he was subjected to a history of persecution at the hands of Syrian authorities and that he is entitled to asylum in the United States and/or restriction on removal to Syria.

The Immigration Judge ("IJ") denied Petitioner's application for asylum on the sole ground that Petitioner had firmly resettled in Canada prior to entering this country. He denied Petitioner's's application for restriction on removal because he found Petitioner's tale of persecution implausible. The IJ then ordered Petitioner removed to Canada, or, in the alternative, to Syria. The Board of Immigration Appeals ("BIA") affirmed without opinion.

We hold that the IJ's firm resettlement determination lacks record support, and that the IJ failed to support his adverse credibility finding with specific, cogent reasons as required by our precedent. Accordingly, we VACATE the BIA's order and REMAND for further proceedings.

**BACKGROUND**

Petitioner's account of his alleged persecution in Syria is in dispute. For background purposes, we first describe the facts asserted by Petitioner in his testimony and affidavit, then provide a brief overview of conditions in Syria, and finally recount this case's procedural history.

<u>Petitioner's Allegations</u>

Petitioner was born and raised in Hamah, Syria. Hamah is closely associated with the Muslim Brotherhood, a religious-based movement opposed to the current Syrian regime. Although Petitioner did not favor the Syrian government, he did not support the Muslim Brotherhood either. However, Petitioner's brother Abdul did speak favorably of the Muslim Brotherhood on occasion, and he once let a Muslim Brotherhood member stay at his house for a few days.

In June 1981, Petitioner began a 30-month term of obligatory military service, working as an air traffic controller. In July 1983, he was arrested and taken to an air force security area. On that same day, his brother Abdul was arrested in a different location in Syria.

After six or seven days, Petitioner was transferred to an underground cell in Damascus. He was beaten daily, suffering a broken nose and broken ribs, and a bright light was kept on at all times. He was interrogated about his knowledge of the Muslim Brotherhood, asked to identify friends in the Muslim Brotherhood, and specifically questioned about his brother Abdul's activities. Petitioner was released in May 1985. The Syrian government treated the time he spent in custody as military service and awarded him retroactive compensation.

From 1985 to 1990, Petitioner worked with his father selling home improvement products. In February 1991 he was arrested for a second time. He was held for several months at a military facility in Hamah, where he was questioned about giving money to his brother's wife. Petitioner testified that he wanted to support her while his brother was in prison, but that his behavior was perceived by Syrian authorities as raising money for families of the Muslim Brotherhood. He was beaten daily, and his injuries included eye injuries, a broken nose, a broken arm, and broken ribs.

In September 1991, Petitioner was transferred to Sidna (or Seydnaya) Prison, where he was held in a single room with more than 100 detainees. Conditions were poor. At some point, he was notified that he had been tried in absentia by a military court and sentenced to life in prison, although he was not informed of the charge against him. In December 1995, Petitioner was released as part of a general amnesty given to about 2,500 political prisoners.

After his release, Petitioner stayed at his father's home for five or six months and had two operations on his injured eye. In June 1996, he used his brother's passport to leave Syria for the Czech Republic. He soon obtained a false Swedish passport and headed to Canada.

Within days of his arrival in Canada in June 1996, Petitioner applied for asylum. Canadian authorities sent him notices to appear regarding his asylum

claim in February and April 1998, but Petitioner did not receive them and he therefore failed to attend a mandatory hearing. Consequently, Canada deemed his asylum claim abandoned and apparently ordered Petitioner to be deported to Syria.[1]

Petitioner was unaware of these developments at the time, and he thought that his application was simply taking a long time to be processed. Meanwhile, in January 1998, Petitioner married a Canadian woman, and they had a daughter later that year. Petitioner had also obtained authorization to accept employment in Canada, and he took a job as a carpenter.

In June 1999, believing that Canada had still not acted on his asylum request, Petitioner's wife filed a spousal application on his behalf. Canadian officials denied the application on the ground that the marriage had not been entered into in good faith.

In late 1999 or early 2000, Petitioner learned that his asylum application had been deemed abandoned. Fearing deportation, he fled for the United States on April 25, 2000.[2]

---

[1] Our record does not contain a copy of the Canadian deportation order. However, in its brief to this Court the government relates that "Elzour missed his Canadian asylum hearing and was ordered deported to Syria."

[2] Unbeknownst to Petitioner, Canadian officials decided to reopen his asylum case about the time he left the country. However, Canadian authorities ultimately determined that Petitioner had again abandoned his asylum claim,

(continued...)

Country Conditions

The administrative record contains the State Department's 1999 Country Report on Human Rights Practices for Syria, which describes a pattern of human rights abuses in Syria. That report generally depicted a regime that tolerated no organized political opposition.

In particular, the report noted that "[a]rbitrary arrest and detention are problems." In cases involving security matters, suspects could be detained incommunicado for prolonged periods without being tried or charged. The government also commonly detained relatives of detainees or fugitives. Further, Syria's security services were known to commit torture and other human rights abuses, particularly in military detention centers. "Serious abuses include[d] reports of extrajudicial killings; the widespread use of torture in detention; poor prison conditions; arbitrary arrest and detention; [and] prolonged detention without trial."

Other human rights reports in the administrative record show that a significant percentage of Syria's political detainees had been arrested for known or suspected affiliation with the Muslim Brotherhood. A 1992 Human Rights Watch report stated that about 75 percent of the political detainees at that time

2(...continued)
having failed to appear at a hearing in February 2001.

were suspected of having an affiliation with the Muslim Brotherhood. Another Human Rights Watch report, discussing Tadmor Prison,[3] noted that "[a]mong those arbitrarily arrested ... in the early 1980s were large numbers of young men, including teenagers, who were relatives, friends or acquaintances of suspected or known Muslim Brothers, or individuals whose names were elicited when suspects were tortured during interrogation."[4]

Procedural History

Before the IJ, Petitioner admitted that he entered the United States without inspection, but applied for asylum pursuant to 8 U.S.C. § 1158 and restriction on removal pursuant to 8 U.S.C. § 1231 and the Convention Against Torture. The IJ denied his application for asylum on the ground that Petitioner had firmly resettled in Canada before entering the United States, noting that he had been given the right to work and to apply for asylum there.

---

[3] Petitioner does not allege that he was held in Tadmor Prison.

[4] In the late 1970s and early 1980s, terrorist groups associated with a faction of the Muslim Brotherhood were involved in numerous assassinations of Syrian government officials. The Muslim Brotherhood also staged an uprising against the Syrian government in Hamah in February 1982.

Next, the IJ denied his application for restriction on removal because he found that Petitioner was not a credible witness.[5] The IJ's adverse credibility finding was based solely on his conclusion that Petitioner's story was implausible. More specifically, the IJ found the following aspects of Petitioner's story unworthy of belief: (1) that Syria would arrest a member of the military in the manner Petitioner described; (2) that Syria would be interested in Petitioner more than a year after the 1982 Hamah uprising; (3) that Syria would arrest Petitioner even though neither he nor his brother were supporters of the Muslim Brotherhood; (4) that Petitioner was detained arbitrarily for the length of time he claims; and (5) that Petitioner was compensated by the Syrian military after his first release from prison. The IJ did not rely on Petitioner's demeanor but rather simply referred to the above factors to support his conclusion that parts of Petitioner's story were implausible.

The IJ ordered Petitioner removed to Canada (or, if Canada refused to accept him or advise whether it would accept him within 90 days, then to Syria).

_____

[5] Restriction on removal was known as "withholding of removal" prior to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. See Wiransane v. Ashcroft, 366 F.3d 889, 892 n.1 (10th Cir. 2004). We use the newer terminology "restriction on removal" throughout this opinion. For simplicity, as the IJ denied Petitioner's applications under 8 U.S.C. § 1231 and the Convention Against Torture on the same ground, we will refer to these two potential bases for relief collectively as Petitioner's application for restriction on removal.

The BIA affirmed without opinion. We have jurisdiction to review the final removal order pursuant to 8 U.S.C. § 1252(a).

**DISCUSSION**

I. Introduction

An alien who fears persecution if removed from the United States has two possible avenues of relief: asylum and restriction on removal. See Tsevegmid v. Ashcroft, 336 F.3d 1231, 1234 (10th Cir. 2003). Asylum generally permits the alien to remain in the United States, whereas restriction on removal forbids removal to the country where persecution is likely to occur. See id.; Wiransane v. Ashcroft, 366 F.3d 889, 893 (10th Cir. 2004).

A. Asylum

"An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated." 8 C.F.R. § 208.22. To be eligible for asylum, an alien must be a "refugee," meaning that he or she must generally be outside his or her country of nationality and "unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or

political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1).[6]  As a general matter, once refugee status is established, whether to grant or deny an asylum application is within the discretion of the Attorney General.  INS v. Cardoza-Fonseca, 480 U.S. 421, 428 n.5 (1987) ("[T]he Attorney General is not required to grant asylum to everyone who meets the definition of refugee.") (emphasis in original).

However, some categories of aliens are, by statute, ineligible to receive asylum even if they fall within the definition of a refugee.  As relevant to our case, asylum is not available if the alien was firmly resettled in another country prior to arriving in the United States.  8 U.S.C. § 1158(b)(2)(A)(vi).  Applicable regulations explain that, with exceptions not relevant in the instant case, an alien is considered to be firmly resettled in a third country when "prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement."  8 C.F.R. § 208.15.[7]

---

[6]  Other circuits have held that persecution on account of political opinion can include persecution based on imputed political opinion.  See Ravindran v. INS, 976 F.2d 754, 760 (1st Cir. 1992) ("An imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the Act."); Aguilera-Cota v. INS, 914 F.2d 1375, 1379 (9th Cir. 1990) ("If the persecutor thinks the person guilty of a political opinion, then the person is at risk.") (quotation omitted).

[7]  An alien will not be considered "firmly resettled," even upon receiving some sort of offer of permanent resettlement, if he or she establishes (1) that the alien's entry into the third country was a necessary consequence of his or her

(continued...)

- 10 -

## B. Restriction on Removal under 8 U.S.C. § 1231

Generally speaking, an alien may not be removed to a particular country if he or she can establish a clear probability of persecution in that country on the basis of race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1231(b)(3)(A); INS v. Stevic, 467 U.S. 407, 429-30 (1984); Woldemeskel v. INS, 257 F.3d 1185, 1193 (10th Cir. 2001). This test requires the alien to show that such persecution is more likely than not. Stevic, 467 U.S. at 429-30; Woldemeskel, 257 F.3d at 1193. It is therefore "more demanding than the 'well-founded fear' standard applicable to an asylum claim." Tsevegmid, 336 F.3d at 1234.

The statutory provision governing restriction on removal also contains a different set of exceptions than does the asylum statute. Significantly, firm resettlement in a third country is not a bar to restriction on removal to the country where persecution is likely. See 8 U.S.C. § 1231(b)(3)(B); Salazar v. Ashcroft, 359 F.3d 45, 52 (1st Cir. 2004) ("Although firm resettlement is ... a bar to the grant of asylum, we have found no statute or regulation that bars the relief of withholding of [removal] on the basis of firm resettlement."). Additionally,

---

[7](...continued)
flight from persecution, the alien stayed there only so long as necessary to arrange onward travel, and he or she established no significant ties there, or (2) that the conditions in the third country were so substantially and consciously restricted that the alien was not in fact resettled there. See 8 C.F.R. § 208.15.

unlike asylum, the decision to grant restriction on removal is mandatory once the statutory criteria are satisfied.  Woldemeskel, 257 F.3d at 1193.

### C.  Convention Against Torture

The Convention Against Torture provides another basis for restricting removal to a particular country.[8]  Pursuant to this treaty, an alien is entitled not to be removed to a country if he or she can show that it is more likely than not that he or she would be tortured if removed to that country.  8 C.F.R. §§ 208.16(c)(2), (4).  This protection is narrower than restriction on removal under 8 U.S.C. § 1231 in some respects, but broader in others.  See Kamalthas v. INS, 251 F.3d 1279, 1283 (9th Cir. 2001).  The alien must show that the persecution at issue would be so severe as to rise to the level of torture, but he or she need not show that it would be on account of a protected classification.  See id.

### D.  Principles of Judicial Review

Because the BIA summarily affirmed the IJ's decision without opinion, we review the IJ's order as the final agency determination.  Sviridov v. Ashcroft, 358

---

[8]  The Convention Against Torture is formally referred to as The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.  The United States implemented the Convention Against Torture through the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (1998).  See Batalova v. Ashcroft, 355 F.3d 1246, 1248 n.2 (10th Cir. 2004).

F.3d 722, 727 (10th Cir. 2004). We consider any legal questions de novo, and we review the agency's findings of fact under the substantial evidence standard. Under that test, our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole. See id.; Kapcia v. INS, 944 F.2d 702, 705 (10th Cir. 1991).[9]

The IJ's credibility determinations, like other findings of fact, are subject to the substantial evidence test. See Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994); Abdulrahman v. Ashcroft, 330 F.3d 587, 597 (3d Cir. 2003); Osorio v. INS, 99 F.3d 928, 931 (9th Cir. 1996). In particular, we have held that in order to determine that an alien is not a credible witness, the IJ must give "specific, cogent reasons" for disbelieving his or her testimony. Sviridov, 358 F.3d at 727.

---

[9] Desta v. Ashcroft, 329 F.3d 1179, 1181, 1187 (10th Cir. 2003), suggests that we review the firm resettlement question for abuse of discretion. Most other circuits review this question for substantial evidence. See Salazar, 359 F.3d at 50 (1st Cir.); Abdille v. Ashcroft, 242 F.3d 477, 483 (3d Cir. 2001); Mussie v. INS, 172 F.3d 329, 331 (4th Cir. 1999). The cases we cited in Desta referred to the Attorney General's discretionary power to grant asylum relief, not to mandatory statutory bars such as firm resettlement. See Kapcia, 944 F.2d at 708; Woldemeskel, 257 F.3d at 1189. Moreover, both before and after Desta, we have held generally (albeit outside the firm resettlement context) that we review IJ and BIA factfinding for substantial evidence. See, e.g., Sviridov, 358 F.3d at 727; Lockett v. INS, 245 F.3d 1126, 1128 (10th Cir. 2001). In any event, in this case our conclusion is unaffected by the standard of review. Committing a legal error or making a factual finding that is not supported by substantial record evidence is necessarily an abuse of discretion.

Finally, our review is confined to the reasoning given by the IJ, and we will not independently search the record for alternative bases to affirm. See SEC v. Chenery Corp., 318 U.S. 80, 95 (1943); Secaida-Rosales v. INS, 331 F.3d 297, 305 (2d Cir. 2003). If an agency "decides a case on a ground believed by an appellate court to be wrong, the case has to be remanded to the agency." See Palavra v. INS, 287 F.3d 690, 693 (8th Cir. 2002). Thus, in the instant case, our review of Petitioner's asylum application is limited to the IJ's firm resettlement determination, and our review of his restriction of removal application is limited to whether the IJ's adverse credibility determination is sustainable.

## II. Firm Resettlement

The firm resettlement bar generally mandates a denial of asylum if a third country in which an alien has resided offers him or her permanent resettlement before the alien enters the United States. See Andriasian v. INS, 180 F.3d 1033, 1043 (9th Cir. 1999). 8 C.F.R. § 208.15 "explicitly centers the firm resettlement analysis on the question whether a third country issued to the alien an offer of some type of official status permitting the alien to reside in that country on a permanent basis." Abdille v. Ashcroft, 242 F.3d 477, 485 (3d Cir. 2001). If a third country has simply allowed the alien to reside there temporarily, the firm resettlement bar does not apply. See Cheo v. INS, 162 F.3d 1227, 1230 (9th Cir.

- 14 -

1998) ("This does not mean that as soon as a person has come to rest at a country other than the country of danger, he cannot get asylum in the United States. Another country may have allowed only a temporary and not a permanent refuge.").

We have recognized that an offer of permanent resettlement may be proven by either direct or circumstantial evidence. See Abdalla v. INS, 43 F.3d 1397, 1399-1400 (10th Cir. 1994). Specifically, when an alien enjoys a lengthy undisturbed stay in a third country, "in the absence of evidence to the contrary, it would be a reasonable inference from the duration that [the third country] allowed the [alien] to stay indefinitely." See Cheo, 162 F.3d at 1229; see also Abdille, 242 F.3d at 487 ("[I]f direct evidence of an offer is unobtainable, such non-offer-based elements can serve as a surrogate for direct evidence of a formal offer of some type of permanent resettlement, if they rise to a sufficient level of clarity and force."). In Abdalla, for example, evidence that an alien lived for 20 years in the United Arab Emirates and possessed a "'residence' visa/permit" was sufficient to suggest permanent resettlement in the absence of contrary evidence. 43 F.3d at 1399; see also Cheo, 162 F.3d at 1229 ("Three years of peaceful residence ... [is]

sufficient to support an inference of permanent resettlement in the absence of evidence to the contrary.").[10]

However, in this case, Petitioner's stay of nearly four years in Canada does not support an inference that he had received some sort of permanent refuge there. On the contrary, the record contains undisputed evidence that Canada both refused to grant Petitioner asylum and refused to grant him permanent status based on his marriage to a Canadian national. Instead, Canada ordered Petitioner deported to Syria. These facts negate any inference that could otherwise be drawn from the length of Petitioner's stay in Canada that he had found permanent refuge there. Cf. Abdalla, 43 F.3d at 1399 (inferring firm resettlement from an "extended, officially sanctioned stay"); Cheo, 162 F.3d at 1229 (inferring firm resettlement from a "three year undisturbed stay"); Andriasian, 180 F.3d at 1043 (finding no firm resettlement because "[t]here is no evidence in the record that [petitioner] was offered resettlement by Armenia – quite the opposite; he was told to go back to Azerbaijan").

There remains the question of whether Petitioner's ability to apply for asylum in Canada was itself an "offer of ... permanent resettlement" which Petitioner declined by failing to appear at a mandatory hearing. The firm

---

[10] Once the government presents evidence indicating the alien was firmly resettled, the burden shifts to the alien to show that this mandatory bar does not apply. See Abdalla, 43 F.3d at 1399; Abdille, 242 F.3d at 491, 491 n.12.

resettlement bar looks to whether permanent refuge was <u>offered</u>, not whether permanent status was ultimately obtained. Refugees may not flee to the United States and receive asylum after having unilaterally rejected safe haven in other nations in which they established significant ties along the way. <u>See</u> 8 C.F.R. § 208.15; <u>Abdalla</u>, 43 F.3d at 1400 (an alien may not "bootstrap[] an asylum claim simply by unilaterally severing his existing ties to a third country"); <u>Cheo</u>, 162 F.3d at 1230 ("A persecuting regime does not entitle its victims to choose one country of asylum over another which first afforded permanent refuge.").

An offer of permanent resettlement need not come in any particular form, and a third country may generally define what an alien must do in order to accept its offer. As relevant here, a third country's offer of permanent resettlement may consist of providing a defined class of aliens a process through which they are entitled to claim permanent refuge. If an alien who is entitled to permanent refuge in another country turns his or her back on that country's offer by failing to take advantage of its procedures for obtaining relief, he or she is not generally eligible for asylum in the United States. In contrast, a mere possibility that an alien might receive permanent refuge through a third country's asylum procedures is not enough to constitute an offer of permanent resettlement.

In the instant case, the IJ based his decision that Petitioner was firmly resettled in Canada exclusively on two grounds: (1) Petitioner was given the right to work in Canada, and (2) he was given the opportunity to apply for asylum there. Yet the fact that Petitioner was allowed to work in Canada does not mean that Canada offered him "permanent resident status, citizenship, or some other type of permanent resettlement." Cf. 8 C.F.R. § 208.15. Further, although the IJ noted that Petitioner had the right to apply for asylum in Canada, he did not examine whether that right constituted an offer of permanent resettlement.

We hold that the IJ's reasons for finding Petitioner subject to the firm resettlement bar are inadequate, and we remand for further consideration of this issue in light of the guidance provided in this opinion.

### III. Credibility

As noted above, the IJ refused to restrict removal to Syria because he found Petitioner's account of persecution there implausible.[11] We will uphold an IJ's adverse credibility determination so long as the IJ provides "specific, cogent reasons" for disbelieving the witness' testimony. Sviridov v. Ashcroft, 358 F.3d 722, 727 (10th Cir. 2004). This standard of review is a deferential one, but we do

---

[11] The burden of proof is on the applicant to show eligibility for restriction on removal, although his or her testimony alone, if credible, may be enough to satisfy this burden. See 8 C.F.R. §§ 208.16(b), 208.16(c)(2).

not blindly accept an IJ's determination that an alien seeking asylum or restriction on removal is not credible. Osorio v. INS, 99 F.3d 928, 931 (9th Cir. 1996); see also Aguilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir. 1990) ("The fact that an IJ considers a petitioner not to be credible constitutes the beginning not the end of our inquiry.").

An IJ's adverse credibility determination may appropriately be based upon such factors as inconsistencies in the witness' testimony, lack of sufficient detail, or implausibility. See Capric v. Ashcroft, 355 F.3d 1075, 1085 (7th Cir. 2004); Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003) (en banc). Additionally, an IJ may find a witness not to be credible because of his or her testimonial demeanor. See Mendoza Manimbao v. Ashcroft, 329 F.3d 655, 662 (9th Cir. 2003) ("[W]e grant special deference to the IJ's eyewitness observations regarding demeanor evidence.") In our case, the IJ did not fault Petitioner's testimony for containing inconsistencies or lacking detail, nor did he make any findings regarding Petitioner's demeanor. Rather, the IJ's adverse credibility finding was based solely on his conclusion that Petitioner's account of persecution was implausible.

An IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion. See Wiransane v. Ashcroft, 366 F.3d 889, 898 (10th Cir. 2004) ("Adverse credibility determinations based on speculation or conjecture are reversible.") (quotation and

alterations omitted); see also Vera-Villegas v. INS, 330 F.3d 1222, 1231 (9th Cir. 2003) ("[C]onjecture is not a substitute for substantial evidence.") (quotation omitted). Accordingly, when an IJ finds that the alleged behavior of a foreign government is implausible, that conclusion must be supported by substantial evidence in the record. See Dia, 353 F.3d at 249 ("Where an IJ bases an adverse credibility determination in part on 'implausibility,' ... such a conclusion will be properly grounded in the record only if it is made against the background of general country conditions."); El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003) ("While we defer to the IJ on credibility questions, that deference is expressly conditioned on support in the record."). Under such circumstances, it would be error for the IJ to fail to explain the basis in evidence for his or her credibility finding. See El Moraghy, 331 F.3d at 205 (quoted with approval in Wiransane, 366 F.3d at 898).

In other words, the IJ may not rest an adverse credibility determination on "his own unsupported opinion as to how an authoritarian government operates." Gao v. Ashcroft, 299 F.3d 266, 278 (3d Cir. 2002); see also Cordero-Trejo v. INS, 40 F.3d 482, 490 (1st Cir. 1994) (implausibility finding may not be "based upon 'expectations' without support in the record"); Abdulrahman v. Ashcroft, 330 F.3d 587, 598 (3d Cir. 2003) ("[T]he IJ fell well short of what we are entitled to expect from judicial officers – her commentary was not confined to the evidence

- 20 -

in the record and smacked of impermissible conjecture"); Mosa v. Rogers, 89 F.3d 601, 604-05 (9th Cir. 1996) (holding that the IJ improperly surmised, without record support, that the Afghan army would not be so desperate as to parachute a suspected mujahidin sympathizer into mujahidin territory after only one week of training) (superceded by statute on other grounds).

Although the IJ in the instant case identified several parts of Petitioner's testimony that he found implausible, he failed to substantiate his skepticism with any record support. The IJ found it "impossible to believe" that Syria would detain Petitioner for such a prolonged period of time, particularly when neither he nor his brother supported the Muslim Brotherhood financially, in writing, or in person. However, uncontradicted materials in the administrative record indicate that lengthy arbitrary detention was problematic in Syria, and that suspected Muslim Brotherhood members and their relatives were among those likely to be detained. The IJ did not explain by reference to anything in the record how these aspects of Petitioner's story were implausible.

Along similar lines, the IJ pointed to no record support for his conclusions that Syria would not arrest and detain a "military man" in such a manner, that any interest Syria might have had in Petitioner due to the 1982 Hamah uprising would have subsided by July 1983, and that Syria would not have compensated Petitioner after his first release from prison in 1985. These conclusions were

based not on any record evidence, but rather on the IJ's own expectations as to how the Syrian government operated. We hold that the IJ's reasoning fell short of his obligation to "provide a foundation for his disbelief of [Petitioner's] testimony on these points." Cf. Gao, 299 F.3d at 278.

Our decision is a limited one. The question we face is not whether we share the IJ's skepticism about particular aspects of Petitioner's story, but only whether the IJ adequately supported his adverse credibility determination with specific, cogent reasons. That requirement demands that there be record support for a finding that Syria's alleged behavior was implausible in light of prevailing country conditions. The IJ provided no such record support in this case, and we therefore remand for further consideration of this issue.

We emphasize that "we are not finding [Petitioner] credible. Rather, we are concluding ... that because of the lack of substantial evidence to support the adverse credibility determination, we will remand in order for the agency to further explain or supplement the record." Cf. Dia, 353 F.3d at 260; INS v. Ventura, 537 U.S. 12, 16 (2002) ("[T]he law entrusts the agency to make the ... decision here in question. In such circumstances a judicial judgment cannot be made to do service for an administrative judgment.") (citations omitted).

## IV. Conclusion

For the foregoing reasons, we GRANT the petition for review, VACATE the decision of the BIA summarily affirming the IJ's order, and REMAND to the BIA for further proceedings consistent with this opinion.