**F I L E D**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

EMMANUEL KOTTO BOUTOU,

Petitioner,

v.

ALBERTO R. GONZALES,
Attorney General,

Respondent.

No. 06-9507
(No. A97-923-376)
(Petition for Review)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

Petitioner Emmanuel Kotto Boutou seeks review of a final order of removal

issued by an immigration judge (IJ) denying Mr. Boutou's requests for asylum,

restriction on removal, and relief under the United Nations Convention Against

Torture (CAT). The Board of Immigration Appeals (BIA) affirmed the IJ's

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. The court generally disfavors the citation of orders and
judgments; nevertheless, an order and judgment may be cited under the terms and
conditions of 10th Cir. R. 36.3.

decision without opinion. We have jurisdiction to review the final order of removal under 8 U.S.C. § 1252(a)(1), and we deny the petition.

## Background

The IJ based his denial of relief entirely on his finding that Mr. Boutou was not credible. In recounting the factual background, therefore, we describe the facts according to Mr. Boutou, and we discuss the documentary evidence where appropriate.

Mr. Boutou is a native and citizen of Cameroon and obtained a degree in political science and economy from the University of Yaounde in 1992. Yaounde is the capital of Cameroon. In 1991, he joined a vigilance group opposed to the regime of Cameroonian President Paul Biya. Mr. Boutou and fourteen other members of the group were arrested by the police for their role in organizing a strike to force the government to address problems such as poverty and unemployment. They were detained for five days in a small cell with no toilet, beaten daily with a baton on the soles of their feet and elsewhere, and released on the condition that they discontinue their protests against the government.

In 1992, Mr. Boutou joined the Social Democratic Front (SDF), another group opposed to President Biya's regime. In 1997, Mr. Boutou and seven other SDF members were arrested by gendarmerie members for urging Cameroonians to boycott the presidential election. They were detained for three days in a small cell with no toilet and were mentally and physically tortured. The torture

included being forced to stare at the sun and to lie on the floor in water. Failure to do either of these things was met with beatings on the buttocks, and Mr. Boutou was beaten a number of times.

On February 20, 1999, Mr. Boutou spoke at an SDF protest rally concerning underemployment. He and two others were arrested by both police and gendarmes for participating in the rally. Three days after he was arrested, Mr. Boutou was tried, convicted of opposing the government, and sentenced to four years' imprisonment. He twice testified that he was sent to the Yoko prison a few days after his trial in February 1999, but the purported release document he offered as evidence indicated that he was first incarcerated in the Douala prison on February 23, 1999, and transferred to Yoko on June 2, 2000. He testified that, during his first month of incarceration at Yoko, he was beaten and tortured daily, including by the administration of electric shocks to his genitals.

While in Yoko, Mr. Boutou was at times escorted out on work details that often were supervised by persons other than prison guards. He met two different women while on these work details, had sexual intercourse with each one once, and fathered a child by each woman. The children were born in April and May 2001. The two encounters with the women occurred three months after he had received the electric shock treatments at Yoko.

Sometime in 2001, Mr. Boutou asked one of the prison guards at Yoko to drive him to the city of Douala, a round trip of approximately 400-500 kilometers,

so that he could obtain a passport. The guard apparently agreed, and Mr. Boutou secured a valid Cameroonian passport in his own name.

Mr. Boutou testified that he was released from Yoko on February 22, 2002, before the expiration of his four-year sentence, because President Biya randomly selected prisoners for early release. But the purported release document indicated that he was released on July 22, 2002.

On November 6, 2002, Mr. Boutou spoke at a political rally in Yaounde. Police and gendarmes broke up the rally and arrested eleven SDF members, but Mr. Boutou eluded capture and went into hiding in a small village fifteen kilometers from Yaounde. The police searched his home and destroyed his property.

While he was in hiding and with the SDF's assistance, Mr. Boutou traveled into Yaounde a number of times. On one occasion, he obtained a Cameroonian passport in the name of Emile Sendji Matanga and a visitor visa in that name from the United States embassy in Yaounde. On other occasions he went to the bank and to see a doctor. Later, he was escorted by a high-ranking gendarme to the airport where he bribed an airport officer to obtain a boarding pass for a plane bound for the United States. He entered the United States in Atlanta, Georgia, on or about January 31, 2003, claiming to be Mr. Matanga, and moved soon thereafter to Oklahoma City, Oklahoma. He applied for asylum in November 2003.

Mr. Boutou had an initial asylum interview in Houston, Texas. Another Cameroonian drove him there from Oklahoma City. He was then ordered to appear before an IJ. At that hearing, Mr. Boutou conceded removability but argued that he was entitled to asylum, restriction on removal, and relief under the CAT. Finding Mr. Boutou completely lacking in credibility, the IJ entered an oral decision denying relief, stating, among other findings, that it was "one of the most flagrant misrepresentations [the Court] has encountered" and that "[t]he Court doesn't believe a word he said here today, and . . . he has [not] come close to establishing anything here, much less that he suffered persecution in the past or torture." Admin. R. at 48. The IJ found that the asylum application was frivolous but refrained from entering an order to that effect out of concern that Mr. Boutou had not been previously warned that knowingly filing a frivolous application can render an alien permanently ineligible for benefits under the immigration laws. See 8 U.S.C. § 1158(d)(6) (requiring appropriate notice to trigger permanent ineligibility). The IJ denied Mr. Boutou's application for voluntary departure. The BIA affirmed, and this petition for review followed.

**Analysis**

Mr. Boutou seeks asylum, restriction on removal, and relief under the CAT. To be eligible for a discretionary grant of asylum, Mr. Boutou must first show that he is a refugee. *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004). To establish refugee status, he must demonstrate that he suffered past persecution

-5-

or has "a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). If Mr. Boutou proves refugee status, he must then persuade the Attorney General to exercise his discretion and grant relief. *See id.* § 1158(b)(1)(A). If Mr. Boutou cannot meet the asylum standard, he "will necessarily fail to meet the higher standards required for restriction on removal under the [Immigration and Nationality Act] or withholding of removal under the [CAT]." *Solomon v. Gonzales, 454 F.3d 1160, 1163 (10th Cir. 2006)*.

The BIA issued a per curiam decision affirming the IJ's decision pursuant to 8 C.F.R. § 1003.1(e)(4). We therefore review the IJ's decision as if it were the BIA's. *Wiransane, 366 F.3d at 897*. "The IJ's adverse asylum decision must be upheld if supported by reasonable, substantial and probative evidence on the record as a whole." *Id.* (quotation omitted). The IJ's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

The substantial evidence test applies to credibility determinations. *See Wiransane, 366 F.3d at 897*. "[B]ecause of the inherent difficulties a purported refugee may have in obtaining documentation to back up his claims, . . . an applicant's testimony, 'if credible . . . may be sufficient to sustain the [applicant's] burden of proof without corroboration.'" *Id.* (quoting 8 C.F.R. § 208.13(a)) (second omission and second alteration in original). Therefore, "an

-6-

IJ generally must give specific, cogent reasons for an adverse credibility finding." *Wiransane*, 366 F.3d at 897 (quotation omitted).[1]

An IJ may base an adverse credibility finding on such factors as inconsistencies in the asylum applicant's testimony, lack of sufficient detail, implausibility, and testimonial demeanor. *Elzour v. Ashcroft*, 378 F.3d 1143, 1152-53 (10th Cir. 2004). But "[a]n IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion." *See id. at 1153*.

Mr. Boutou generally argues that the IJ based his credibility determination on unsupported personal opinion. More specifically, he first asserts that his testimony concerning overcrowding and lack of sanitation during his confinements is consistent with the United States Department of State Country Report for Cameroon issued on February 25, 2004, which he submitted in support of his application. Although his testimony concerning such conditions is consistent with the Country Report, the IJ did not specifically comment on that testimony except to recite that Mr. Boutou had described those conditions. There

---

[1]    The REAL ID Act of 2005 includes new provisions relating to agency credibility determinations, now codified at 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C), and 1231(b)(3)(C). These provisions, however, only apply to aliens who applied for asylum or other relief after May 11, 2005, the effective date of the Act. *See* Pub. L. No. 109-13, div. B, § 101(h)(2), 119 Stat. 231, 305. Mr. Boutou applied for asylum, restriction on removal, and CAT relief in 2003. Hence, these new provisions do not apply to his claims.

is no indication that the IJ placed any importance on whether Mr. Boutou's description of the overcrowding and lack of sanitation was credible or not.

Mr. Boutou next takes issue with the IJ's finding that his claim to have fathered two children while imprisoned in Yoko was part of the "preposterous" manner in which he testified, Admin. R. at 44. Mr. Boutou compares this finding with the credibility determination in *Elzour* concerning the implausibility of the length and basis of the alien's purported detention by the Syrian government, *see Elzour*, 378 F.3d at 1153. We held in *Elzour* that the IJ's adverse credibility finding was in error because it was based "on the IJ's own expectations as to how the Syrian government operated," *id.* at 1154, and was at odds with uncontradicted materials in the record, *id.* at 1153.

Contrary to Mr. Boutou's argument, *Elzour* does not compel a similar conclusion in this case concerning the IJ's finding that Mr. Boutou's claim to have fathered children while imprisoned at Yoko was implausible. The IJ based this finding on the inherent inconsistency in the range of treatment, from torture to extreme permissiveness, Mr. Boutou claimed he received while incarcerated, not on the IJ's own personal opinion concerning the degree of freedom prison officials might have permitted. And the IJ's finding is not inconsistent with the statement in the Country Report to which Mr. Boutou apparently refers, that "[p]risoners sometimes could bribe wardens for special favors or treatment, including temporary freedom," Admin. R. at 189. Mr. Boutou never referenced

bribing a warden or anyone else. He testified that he met the mothers of his children while on work details that sometimes were supervised by persons other than prison guards. *Id.* at 106-07. Thus, Mr. Boutou has not demonstrated an inconsistency with the record that calls into question the IJ's finding concerning the plausibility that he fathered children while at Yoko. In any event, that finding was made on the implicit assumption that Mr. Boutou was in fact incarcerated at Yoko. But from the IJ's sweeping statement that he did not "believe a word" Mr. Boutou had said, *id.* at 48, it appears that the IJ did not believe that Mr. Boutou had ever been incarcerated on any of the occasions he claimed. In the face of this ultimate finding, the issue of whether Mr. Boutou's story about fathering children while in prison was credible approaches immateriality.

Mr. Boutou next cites to *de Leon-Barrios v. INS*, 116 F.3d 391, 393 (9th Cir. 1997), in support of his proposition that "an adverse credibility finding will not be upheld when it is solely supported by minor inconsistencies and minor omissions relating to unimportant facts," Aplt. Opening Br. at 8.[2] Mr. Boutou contends that the IJ relied on two minor inconsistencies. First, Mr. Boutou points

---

[2]      In *de Leon-Barrios*, the Ninth Circuit was faced with inconsistencies that "involved the heart of the asylum claim." *de Leon-Barrios*, 116 F.3d at 394 (quotation omitted). With the passage of the REAL ID Act, Congress appears to have overridden this limitation with what is now codified at 8 U.S.C. § 1158(b)(1)(B)(iii). That section provides, in pertinent part, that a trier of fact may base a credibility determination on "all relevant factors . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Id.* Again, this provision applies only to asylum applications filed after May 11, 2005. *See supra* note 1. It does not apply to this case.

to the following statement the IJ made about the date Mr. Boutou joined the SDF: "He indicates that he joined that party in, it's not clear whether it's '89 or '92, but in any event, he says he was arrested and incarcerated on at least three separate occasions . . . ." Admin. R. at 41. There is no indication that the date on which Mr. Boutou claimed to have joined the SDF was material to the IJ's adverse credibility finding. The IJ mentioned this 1989/1992 issue only once, in passing, and did not refer back to it.

The second inconsistency Mr. Boutou characterizes as minor is the discrepancy concerning the dates of his purported imprisonment at Yoko. Contrary to Mr. Boutou's argument, this is not a minor inconsistency. Given the alleged gravity of Mr. Boutou's detention, it was reasonable for the IJ to expect him to have the dates that he arrived at and was released from Yoko generally correct if he had in fact been imprisoned there. But the dates Mr. Boutou gave were substantially different than those in the purported release document he himself submitted. He initially testified that he arrived at Yoko immediately after his February 1999 conviction, which was some sixteen months earlier than the date noted in the document, June 2, 2000. The date he adamantly claimed he was released on, February 22, 2002, was five months earlier than the date in the document, July 22, 2002.

Furthermore, the IJ found that Mr. Boutou's testimony that he was released on February 22 conflicted with information contained in a doctor's letter that

-10-

Mr. Boutou submitted. In the letter, the doctor stated that he had treated Mr. Boutou, to whom he referred as a "student at the college of law studies of the University of Yaounde," *id.* at 179,[3] for chronic dysentery from February 1, 2002, until November 15, 2002. Mr. Boutou maintained that the doctor's letter was incorrect as to the date on which treatment began because the doctor did not treat him in prison, and he was still in prison on February 1. The result was substantial confusion concerning these dates that Mr. Boutou was unable to explain to the IJ's satisfaction.

Even if we agreed with Mr. Boutou that the conflicting imprisonment and release dates were minor inconsistencies, the IJ gave other, unchallenged reasons that adequately support his finding. Those reasons include: (i) the IJ's observation of Mr. Boutou's demeanor evidencing evasiveness and an attempt to confuse, in particular while explaining why he presented himself as Emile Matanga upon entry rather than seeking asylum immediately in his own name; (ii) the fact that letters written in 2003, one purportedly by the SDF secretary and one purportedly by two individuals active in the Cameroonian bar association, failed to reference Mr. Boutou's arrests and imprisonment; (iii) the inconsistency between the doctor's reference to Mr. Boutou as a law student and Mr. Boutou's testimony that he had not been in school for some time; (iv) the inconsistency

---

[3] We rely on the English translation of the doctor's letter, which is in French, that Mr. Boutou provided.

between Mr. Boutou's claim to have been in hiding and his testimony that he ventured out into Yaounde to obtain a passport; (v) the implausibility of his story that he was able to obtain a high-ranking gendarme to escort him to the airport; and (vi) the fact that other Cameroonians in the Oklahoma City area who knew Mr. Boutou did not testify on his behalf, from which the IJ drew an adverse inference. These additional specific, cogent reasons adequately support the IJ's adverse credibility finding even without reference to the inconsistent imprisonment and release dates.

Mr. Boutou's final specific argument that the IJ based his credibility determination on unsupported personal opinion is that his claim that he was tortured in prison is supported by the Country Report. The Country Report does state that torture is widespread in the Cameroon prisons. *Id.* at 188. But "the purpose of country conditions evidence . . . is not to corroborate specific acts of persecution (which can rarely be corroborated through documentation), but to provide information about the context in which the alleged persecution took place, in order that the factfinder may intelligently evaluate the petitioner's credibility." *Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir. 1999). Documentary evidence of country conditions can help to establish an objective basis for a claim by placing an asylum applicant's testimony into context, but it cannot independently establish the claim. *Zahedi v. INS*, 222 F.3d 1157, 1163 (9th Cir. 2000). The fact that the Country Report supports Mr. Boutou's

allegations of torture, therefore, does not mean that the IJ was required to believe those allegations. In view of the many other credibility problems the IJ identified that called into serious doubt Mr. Boutou's claim to have been imprisoned at all, the IJ justifiably disbelieved Mr. Boutou's claim to have been tortured despite its consistency with the Country Report.

## Conclusion

Substantial evidence supports the IJ's denial of Mr. Boutou's asylum application. Because Mr. Boutou has failed to meet the standard for asylum, he has necessarily failed to meet the more stringent requirements for restriction on removal and relief under the CAT. *See Solomon*, 454 F.3d at 1163. Accordingly, the petition for review is DENIED.

Entered for the Court


Michael W. McConnell
Circuit Judge