**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 25, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ARTURO AMADOR-LECHUGA,

    Petitioner,

v.

MERRICK B. GARLAND, United States
Attorney General,

    Respondent.

No. 21-9555
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BALDOCK**, and **EID**, Circuit Judges.
_____

Arturo Amador-Lechuga, a native and citizen of Mexico, petitions for review

of a decision of the Board of Immigration Appeals (BIA) upholding the denial of his

applications for withholding of removal and relief under the Convention Against

Torture (CAT).  Exercising jurisdiction under 8 U.S.C. § 1252(a)(1), we deny the

petition for review.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## BACKGROUND

Amador-Lechuga most recently entered the United States in March 2019. This was his third recorded attempt to enter this country. He previously attempted an entry in 2015 but was removed to Mexico pursuant to an expedited removal order. In 2018, after he again attempted to enter the United States, the Department of Homeland Security reinstated his underlying removal order and again removed him to Mexico. As a result of this second entry, he was convicted in federal court of illegal reentry.

In the 2015 and 2018 removal proceedings and in his criminal proceeding, Amador-Lechuga did not express a fear of returning to Mexico. But after the March 2019 entry an asylum officer interviewed him and found he had established a reasonable fear of torture if removed to Mexico. As a result, he was placed in withholding-only proceedings, *see* 8 C.F.R. § 1208.31(e), where he filed an application for withholding of removal and CAT relief. An immigration judge (IJ) held a hearing on his application.

Amador-Lechuga testified at the hearing that he grew up in Durango, Mexico. He worked for 16 years as a policeman. His last position with the police, which he held for more than four years, required him to guard a district attorney.

Problems developed for him in that position after the director of the judicial police reassigned him to guard a drug cartel leader. Amador-Lechuga initially refused, telling the director that he "wasn't willing to participate in that and that I did not want that assignment." R., Vol. 1 at 98. The director became upset and insisted

2

in a threatening manner that he would have to take the assignment or "face the consequences." *Id.* at 99. Amador-Lechuga complied and guarded the cartel boss for over a year. During this time, he reported to the director once or twice a week. When the director asked him how the job was going, he responded that "it was fine." *Id.* at 101.

Four months after the guard assignment began, Amador-Lechuga sought medical disability for a knee issue. He hoped this would give him a reason to leave his assignment. But when he submitted his disability paperwork to the director, the director became upset, refused to release him from the assignment, and told him he had to get back to work.

Around the same time, a fellow agent who was also assigned to guard the cartel boss decided to flee. He left Amador-Lechuga his weapons and departed. According to Amador-Lechuga, the agent fled "[b]ecause of fear" of "[t]he cartel and the retaliation he could suffer from the director." *Id.* at 103.

The assignment eventually ended when the Mexican navy captured the cartel boss. Amador-Lechuga became afraid that the cartel would retaliate against him because the man he had been assigned to guard had been captured. He hid in his home for approximately 15 days. When he left his home to visit his mother, the police caught him.

The police took him to the prosecutor's office and turned him over to the director. The director asked him what had happened. Amador-Lechuga explained that the navy had captured the cartel boss and that he had had nothing to do with that.

The director responded "[t]hat nobody needed to know about this and that [he] wasn't supposed to speak to anybody." *Id.* at 107. Amador-Lechuga began to argue with the director, telling him that "they were responsible for what was happening to me because they had sent me to guard this person." *Id.*

The director got on the phone with someone who Amador-Lechuga believes was a highly placed member of the cartel. He handed the phone to Amador-Lechuga. The person on the phone told him they were going to get him and kill him by burning him alive. When Amador-Lechuga asked the director why they were doing this, the director responded that it was the cartel, not he, who gave the orders.

Amador-Lechuga tried to flee, but he was caught outside the director's office and taken to a cell. After he spent seven hours in the cell, he was taken to a warehouse, seated in a chair, and handcuffed. The director told Amador-Lechuga that Amador-Lechuga "couldn't say anything" because "what [he] knew wasn't supposed to be known." *Id.* at 111. He then placed another call to the cartel member and held the phone up to Amador-Lechuga's ear. The person on the phone again threatened to burn him alive.

Despite the death threats, the director and the cartel member reached an agreement with Amador-Lechuga that he would be permitted to leave his position and "disappear." *Id.* at 112. After fleeing, however, Amador-Lechuga continued to fear for his life because he believed the agreement to let him go had only provided him with a temporary reprieve.

4

He went to hide at his sister's house. For the next seven to nine months, he only left the house once, to consult with a lawyer about filing a wrongful termination suit. After the attorney filed a suit against the district attorney's office, its acting director sent Amador-Lechuga a message through his attorney "saying not to stir anything with that matter because I already knew what was going to happen to me." *Id.* at 121. As a result, his attorney became afraid and abandoned the lawsuit, which apparently was dismissed.

Amador-Lechuga began to feel unsafe at his sister's house, so he went to hide in the mountains for around six months, then moved to Ciudad Juarez near the border with the United States. From Ciudad Juarez, he made his first attempt to enter the United States. He was caught and removed. When asked during the removal process if he was afraid to return to Mexico, he said he was not. He explained this response by claiming that he did not understand the asylum process and thought if he expressed such a fear he would be turned over to the Mexican government.

Amador-Lechuga was removed to Mexico City and returned voluntarily to Durango to stay at his sister's house. From there, he moved to a ranch for a few months, then relocated to Reynosa, where he made another attempt to cross the border but was caught again. He was removed to Mexico a second time and he again returned to Durango. He then returned to Ciudad Juarez and made his current, third attempt to enter the United States.

In his testimony, Amador-Lechuga also described an additional threat that occurred after his March 2019 entry. A group of people dressed in military-style

uniforms entered his brother-in-law's house in Mazatlan, about three and a half hours from Durango. They beat the brother-in-law and asked about Amador-Lechuga's whereabouts. They then kidnapped the brother-in-law and warned the family that if they filed a police report they would return and kill them all. The family has not seen the brother-in-law since. Amador-Lechuga believes he was killed.

Amador-Lechuga testified there was no place in Mexico where he could live safely because "the cartel and the government are equals" and "[t]hey work together." *Id.* at 126. He alleges past and future persecution due to his anti-cartel or anti-corruption political opinions, whether real or imputed, and because he belongs to a social group of former Mexican law enforcement officers or former Mexican law enforcement officers against corruption.

The IJ did not find Amador-Lechuga's testimony credible. But she stated that credibility aside, Amador-Lechuga's "inconsistencies, vague testimony, and lack of corroboration fail to persuade the Court that his fears of persecution or torture are likely to be realized." *Id.* at 65. She denied his withholding claim because he had not established a nexus to a protected ground. The IJ further determined that Amador-Lechuga had not established his eligibility for CAT protection because his past harm did not rise to the level of torture; he had not filed a police report, even when in other parts of Mexico than those where the harm occurred; he had not shown why he would suffer torture in other parts of the country or could not reasonably relocate to avoid future harm; he failed to provide corroboration for the events involving his brother-in-law or to explain the kidnapping after a seven-year period

during which his other relatives in or near Durango had not been harmed; and he failed to show that he would be tortured by or with the acquiescence of the Mexican government.

Amador-Lechuga appealed to the BIA. The BIA determined that even if he had testified credibly, he failed to show that the IJ's determination that he had failed to establish a nexus between past or future harm and a protected ground was clearly erroneous. Addressing his CAT claim, the BIA "discern[ed] no clear error in the [IJ's] determination that [he] did not establish that he will more likely than not be tortured in Mexico by or with the consent or acquiescence of a public official." *Id.* at 4.

## DISCUSSION

On appeal of a BIA order, "[t]he scope of our review is governed by the form of the BIA decision." *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011). Where, as here, a single Board member issues a brief order affirming the IJ's decision, we review the order as the final agency determination and limit our review to the grounds relied upon by the BIA. *Uanreroro v. Gonzales*, 443 F.3d 1197, 1203-04 (10th Cir. 2006). But "when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Id.* at 1204.

"[W]e review the agency's findings of fact under the substantial evidence standard. Under that test, our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as

7

a whole." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). "To obtain reversal of factual findings, a petitioner must show the evidence he presented was so compelling that no reasonable factfinder could find as the BIA did." *Gutierrez-Orozco v. Lynch*, 810 F.3d 1243, 1245 (10th Cir. 2016) (internal quotation marks omitted). We review the agency's legal determinations de novo. *See Elzour*, 378 F.3d at 1150.

### 1. Withholding of Removal

To obtain withholding of removal, Amador-Lechuga needed to demonstrate that his "life or freedom would be threatened in [Mexico] because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also id.* § 1229a(c)(4)(A) (stating non-citizen has burden to establish entitlement to relief). The parties agree this required him to establish a "nexus" between the harm asserted and one of the protected grounds by showing that the protected ground "was or will be *at least one central reason* for persecuting [him]." *Id.* § 1158(b)(1)(B)(i) (emphasis added).[1]

In establishing the required nexus, the motive of the alleged persecutors is "critical." *Rodas-Orellana v. Holder*, 780 F.3d 982, 996 (10th Cir. 2015) (internal quotation marks omitted) (discussing similar nexus requirement for asylum claims). "[T]he protected ground cannot play a minor role in the alien's past mistreatment or

---

[1] The "one central reason" standard is explicitly stated in the asylum statute. *See* 8 U.S.C. § 1158(b)(1)(B)(i). Because Amador-Lechuga does not argue that a different standard applies to the nexus requirement for his withholding claim, we apply the "one central reason" standard to his claim.

fears of future mistreatment.  That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010) (internal quotation marks omitted).

Amador-Lechuga contends the BIA erred both legally and factually by finding a lack of a sufficient nexus.  He argues the BIA committed legal error by "simply stat[ing] that the IJ did not err in finding [he] was targeted for personal retaliation," without considering the possibility that his persecutors acted from mixed motives and that persecution for his anti-corruption beliefs was at least one central reason for their actions.  Pet'r Br. at 16.  *See Orellana-Recinos v. Garland*, 993 F.3d 851, 855 (10th Cir. 2021) (acknowledging that an alleged "persecutor can have multiple motives for targeting someone").

But the BIA did not ignore mixed-motive evidence.  Instead, after reciting the "one central reason" standard, *see* Admin. R. at 4, it determined that Amador-Lechuga's "*only* testimony regarding motives of the corrupt police officers and cartel members was that he feared personal retaliation for the cartel leader being captured and he was threatened to not expose the relationship between the cartel and corrupt police officers."  *Id.* (emphasis added).  In other words, the BIA concluded there was no evidence to support a finding that Amador-Lechuga's anti-corruption beliefs played any role in his past mistreatment or fear of future mistreatment that could be factored into a mixed-motive analysis.  We discern no error in failing to perform a formal mixed-motive analysis where there was no evidence to suggest that one central reason for the alleged persecution might have been a protected ground.

9

But Amador-Lechuga also contends there *was* such evidence, and that the BIA's failure to consider it means its decision lacks substantial evidence. *See* Pet'r Br. at 18 ("Every comment made and action taken by Mr. Amador Lechuga after he was informed of the order to guard a cartel boss demonstrated his anti-corruption beliefs. . . . [He] was never threatened until after he told [the director] he did not want to be involved in the cartel and did not want the post.").[2]

Evidence showing "corrupt officials who act solely out of personal revenge or a desire to avoid the exposure of a lucrative scheme of corruption, without a significant concern about the alien's political beliefs, perceived or otherwise" does not establish the requisite nexus. *Matter of N-M-*, 25 I. & N. Dec. 526, 531-32 (B.I.A. 2011). Nor is there evidence of concern or motivation for persecution springing from Amador-Lechuga's membership in a particular social group.[3] Amador-Lechuga cites no evidence that he informed the director, or anyone else, that he actively opposed their corruption. Nor did his persecutors mention his political beliefs or his alleged anti-corruption stance. Instead, he infers that his persecutors concluded from his complaints about, and attempts to avoid, his assignment that he

---

[2] Amador-Lechuga does not point us to any testimony that he told the director he "did not want to be involved in the cartel," as opposed to merely stating he "did not want the post," Pet'r Br. at 18.

[3] Amador-Lechuga focuses his analysis on the particular social group of "Former Mexican law enforcement *against corruption*," Pet'r Br. at 13 (emphasis added, internal quotation marks omitted), thus tying his social group designation to an anti-corruption stance. But for reasons the IJ gave, *see* R., Vol. 1 at 54, he also failed to show a nexus to his alleged membership in the social group of "former Mexican law enforcement," generally.

held anti-corruption beliefs.  Even if one could plausibly draw such a proposed

inference from his testimony (which the BIA did not), to obtain a reversal of the

BIA's factual findings Amador-Lechuga must show that *no reasonable factfinder*

would find as the BIA did.  *See Gutierrez-Orozco*, 810 F.3d at 1245; *see also*

8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive

unless any reasonable adjudicator would be compelled to conclude to the contrary.").

He has failed to satisfy that demanding standard concerning the BIA's findings.[4]  We

therefore affirm the denial of withholding of removal relief.

## 2.  CAT Relief

Unlike withholding of removal, CAT withholding does not require a nexus

between the asserted torture and a statutorily protected ground.  *See Ritonga*,

---

[4] Amador-Lechuga also argues that in reaching its determination concerning
nexus the BIA should have considered country conditions in Mexico, including the
"notorious[] corrupt[ion]" of the Mexican government, based on the voluminous
evidence he submitted.  Pet'r Br. at 19.  *See Matter of N-M-*, 25 I. & N. Dec. at 533
(in assessing nexus to a protected political belief, the agency "should also consider
evidence regarding the pervasiveness of government corruption, as well as whether
there are direct ties between the corrupt elements and higher level officials").  The IJ
stated she had "thoroughly considered all evidence submitted."  R., Vol. 1 at 64.  The
BIA specifically addressed the evidence of "general country conditions documenting
corruption" in connection with the CAT claim.  *Id.* at 4.  "[T]he BIA has no duty to
write an exegesis on every contention."  *Ritonga*, 633 F.3d at 978 (internal quotation
marks omitted).  Given Amador-Lechuga's testimony concerning his alleged
persecutors' motivations, the agency focused its nexus analysis on "personal
retaliation" from "corrupt police officers and cartel members."  *See* R., Vol. 1 at 4.
Amador-Lechuga fails to point to specific evidence that his reluctance to guard a
drug cartel boss or his persecutors' fear that he might disclose their corrupt
arrangement implicated higher levels of the Mexican government or its political
system who might persecute him on political grounds, beyond the corrupt officials
and cartel members who threatened him.  The agency adequately addressed the
relevant factors in connection with its nexus determination.

633 F.3d at 978. "To be eligible for relief under the CAT, an individual must establish that it is more likely than not that he or she would be tortured if returned to the proposed country of removal." *Zhi Wei Pang v. Holder*, 665 F.3d 1226, 1233-34 (10th Cir. 2012) (internal quotation marks omitted). Torture involves "severe pain or suffering, whether physical or mental," and must be "inflicted by, or at the instigation of, or with the consent and acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1).

In assessing the likelihood of future torture, the agency should consider such factors as (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; (3) evidence of mass violations of human rights within the country of removal, where applicable; and (4) any other relevant information regarding conditions in the country of removal. *Id.* § 1208.16(c)(3)(i)-(iv).

Here, the agency determined (1) Amador-Lechuga had not suffered harm rising to the level of torture; (2) his threats of harm were localized to a limited area of Mexico, namely, the state of Durango; (3) he never filed a police report about the threats he received, even when he was in Ciudad Juarez, an area removed from the alleged threats he faced; (4) the last alleged threat he received was in 2013, after he filed a lawsuit for wrongful termination; and (5) his immediate family members and siblings had remained in Durango without incident.

Amador-Lechuga argues he was previously tortured by Mexican governmental officials. But torture "is an *extreme* form of cruel and inhuman treatment and does

12

not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture," *id.* § 1208.18(a)(2) (emphasis added). The agency reasonably determined that standard was not met here, based on the threats and brief detention he endured. He also contends that country conditions in Mexico, when considered along with his brother-in-law's beating, kidnapping, and disappearance, support his fear that he will more than likely be tortured if returned to Mexico. He argues the BIA ignored evidence that the Mexican government fails to protect its citizens from the drug cartels and participates in torture and human rights violations on behalf of those cartels. But as the BIA noted, "the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute sufficient grounds for determining that a particular person would be in danger of being subjected to torture upon his return to that country." *Matter of J-E-*, 23 I. & N. Dec. 291, 303 (B.I.A. 2002), *abrogated on other grounds by Azanor v. Ashcroft*, 364 F.3d 1013, 1019-20 (9th Cir. 2004). And the agency found his unsupported and unexplained allegations about the brother-in-law's kidnapping unpersuasive. *See* R., Vol. 1 at 4-5, 69.

In sum, Amador-Lechuga's arguments do not overcome the high bar necessary to set aside the BIA's factual findings in a petition for review. The BIA concluded there was insufficient basis to conclude that he would likely face torture if he returned to Mexico. We cannot conclude any reasonable factfinder would be compelled to reach the opposite finding, *Gutierrez-Orozco*, 810 F.3d at 1245, and so we cannot set aside the agency's determination.

### 3.  Request for Three-Member Panel

Amador-Lechuga argues his administrative appeal should have been assigned to a three-member panel, both because the BIA needed to review the IJ's clearly erroneous factual determination, *see* 8 C.F.R. § 1003.1(e)(6)(v); and because the BIA needed to review the IJ's decision which was not in conformity with the law or applicable precedents, *see id.* § 1003.1(e)(6)(iii).  The regulation he cites, however, "does not *mandate* three-member panels," but outlines the circumstances in which a case *may* be assigned to a three-member panel.  *Maatougui v. Holder*, 738 F.3d 1230, 1239 n.5 (10th Cir. 2013).  The BIA will exercise review by a full three-member panel and issue a full explanatory opinion only "in a particularly difficult or important case."  *Sarr v. Gonzales*, 474 F.3d 783, 789 (10th Cir. 2007) (internal quotation marks omitted).  Amador-Lechuga fails to show that the BIA abused its discretion in declining to refer his appeal to a three-member panel.

## CONCLUSION

We deny the petition for review. We grant Amador-Lechuga's motion for leave to proceed on appeal without prepayment of costs or fees.

Entered for the Court


Bobby R. Baldock
Circuit Judge