**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 18, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ZHEN RONG LIN,

      Petitioner,

v.

ALBERTO R. GONZALES,
Attorney General,

      Respondent.

No. 06-9524
(No. A76-279-171)
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN** and **BRORBY**, Circuit Judges, and **BROWN**,[**] District Judge.

---

Petitioner Zhen Rong Lin, a native and citizen of China, seeks review of

a decision of the Board of Immigration Appeals (BIA) that dismissed his appeal

from an immigration judge's (IJ) decision denying his application for asylum,

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**]     The Honorable Wesley E. Brown, Senior District Judge, District of Kansas, sitting by designation.

restriction on removal, and protection under the Convention Against Torture

(CAT). We deny the petition for review.

BACKGROUND

On June 8, 1998, Lin was interdicted at sea near Agana, Guam, in a

Chinese fishing vessel that contained more than seventy undocumented aliens

from China who were being smuggled to Guam. During the ensuing

investigation, immigration special agent Michael D. Hernandez prepared a Form

I-213, which stated that

> it appears that [Lin] boarded the . . . vessel as a crewman/enforcer as
> probably arranged by the smuggling bosses in China, also known as
> "SnakeHeads." [Lin] was identified by many of the smugglees as an
> enforcer. The enforcers on the boat were essentially crewmen who
> controlled the smugglees, and whose responsibilities included
> cooking for the smugglees, controlling the aliens with the use of
> clubs, and handcuffing the aliens. [Lin] was positively identified as
> a person who both carried a club and who handcuffed some of the
> smugglees during the off-loading process.

R. at 367. Lin refused to speak with the officers, so no statement was taken at

that time.

The next day, Lin was interviewed by a senior immigration inspector with

the assistance of an interpreter. He told the inspector that he left China "[d]ue to

economic difficulties," *id*. at 231, and he was afraid that he would be harmed if he

returned there.

Lin was charged with and pled guilty to improper entry into the United

States in violation of 8 U.S.C. § 1325. In subsequent immigration proceedings,

he conceded removability, and applied for asylum, restriction on removal, and protection under CAT, on the ground that he faced persecution under China's family-planning policies. The IJ granted the government's motion to amend the Notice to Appear to reflect that Lin was an arriving alien, and at the same time received in evidence the records of his federal court conviction and the Form I-213.

Lin's removal hearing took place on September 13, 2005, in Aurora, Colorado. After considering the evidence, the IJ concluded that his testimony lacked credibility, denied his applications, and ordered him removed to China. The BIA summarily affirmed the IJ's decision and this petition for review followed.

LIN'S ACCOUNT OF EVENTS

Lin married Wen Lin in April 1995, and shortly thereafter they applied for a birth permit. Because they were an older couple (he was twenty-five and she was twenty-four), Chen Chow, the village family-planning supervisor, allegedly gave them verbal permission to become pregnant without waiting for a permit, because the person who actually issued the permits was out of the office.[1] Wen

---

[1] Lin testified that he and Wen wanted to conceive as soon as possible because they were considered an older couple by village standards and his mother was anxious for a grandchild.

became pregnant in May 1995, and their daughter was born on February 10, 1996.[2]

Trouble first began before their daughter's birth when the couple received the actual birth permit dated June 5, 1995, which stated that no child should be born before April 1996. Although Lin did not yet know that Wen was pregnant, he testified that he immediately went to see Chen about the discrepancy in the dates. Chen told him "[a]t that time, I promise[d] you, but this is the document I'm issuing today. . . . why [are] you so afraid since you guys are not pregnant anyway." R. at 138.

Shortly thereafter, Lin discovered that Wen was in fact pregnant, and he went back to see Chen, who again told him not to worry. According to the document submitted by Lin at his hearing, at the same time village officials registered the date of Wen's pregnancy as May 1995.

Following his daughter's birth in February 1996, the village committee registered her birth on the permit as January, but then corrected the date to February.[3] Although the permit still listed April 1996, as the date after which the couple could have a child, Lin testified that he was not worried because

[2]    The village family-planning policy allows for only one child. If the first child is female, however, a couple can apply for a second birth permit after waiting four years.

[3]    A forensic document examiner from the Immigration and Naturalization Service opined that the February 1996 date of birth on the permit had been altered twice. R. at 359.

"Mr. Chen, he promised . . . it's okay, and then secondly we were [a] late married couple." *Id*. at 143-44. However, when Lin tried to have his daughter listed on his household registry, village officials refused to do so, because she had been born earlier than April 1996. He returned again to see Chen, who "comforted" him, and said "don't worry, I will take care of it." *Id*. at 144.

Nonetheless, in July 1996, Lin's mother received a notice from village officials that Wen needed to be sterilized before October 1, 1996. The couple again sought out Chen, but learned that he had been replaced by a new supervisor, who told them that "he didn't care what [the previous supervisor] did and promised to [them]," *id*. at 147, and that he or his wife should be sterilized.

Lin testified that neither he nor his wife underwent sterilization at that time because his "mom . . . really [wanted] to have another grandkid, a boy, and . . . in the village, it's very important to have a male child. If you don't have a male child, you will be teased." *Id*. at 148. After his wife failed to report for sterilization, the village family-planning unit visited his job where he worked as an auto mechanic, which in turn issued a notice that he should report for sterilization within three days. Lin's failure to undergo the procedure resulted in the loss of his job.

Undeterred, family-planning officials continued to visit his mother's home where Lin and his family had sought refuge, to urge compliance with the sterilization procedure. In May 1997, fearing arrest, Lin, Wen, and their daughter

moved to his mother-in-law's house. When the officials "couldn't find [them]," *id.* at 150, they "removed all the furniture that we acquired from our marriage . . . [and] start[ed] destroying and tak[ing] our home apart." *Id.* "I'm very clear about the date. It's March 8, 1998." *Id.*

Even in the face of these escalating tactics, Lin emerged from hiding to "tr[y] to argue with [the officials], reason with them." *Id.* He described the scene at his home as including more than ten officials, and the new supervisor, who were trying to dismantle a window. His pleas went unheeded, and the supervisor called him a "stupid pig," *id.* at 152, and said that he would be arrested and sterilized. The insults continued when Lin called the supervisor a "running dog for the Communist Party."[4] *Id.* After one official punched him in the nose, the ensuing "confusion" and "commotion" allowed him to "escape" from the village, and flee to the mountainside home of a "fellow student." *Id.* at 153.

In an effort to flush the couple out of hiding, village officials arrested and jailed Lin's mother for a week. After her release, they arrested and jailed his father-in-law for several days. Although the couple considered turning themselves in, his mother's advice convinced them to stay the course: "[T]hen I remember[ed] my mom, she told us . . . that no matter what happened to them,

---

[4]    At his hearing, Lin testified that he was afraid to return to China because he would be placed on trial for having insulted the supervisor during this encounter.

you guys should insist on what you guys believe in, and people also tell us that . . . in a short period of time, they will release us." *Id.* at 156.

Tired of hiding from officials, Lin and his wife decided that he should leave China. "[M]y fellow students, they tried to convince me to come to the United States that things will work out . . . and then they introduced me to somebody . . . through my fellow student's family member." *Id.* at 157. That "somebody" was a member of the Snakeheads – a group of smugglers. Lin made a deal that because he was "coming by boat, and in case during the journey there was a shipwreck, and I never arrived, . . . I will only have to pay after I arrived." *Id.* He left China on May 28, 1998. The price of the trip – $15,000 – allegedly was paid by his relatives to the Snakeheads after he arrived in Guam.

Lin testified that in September 1999 Wen was arrested at his aunt's house and later forcibly sterilized. In correspondence, she told him not to return to China because "those people are still looking for revenge." *Id.* at 160. "They will put me through a trial . . . because they said that . . . I was abusing them verbally." *Id.* at 161.

On direct examination, the government objected to leading questions by Lin's attorney, complaining that Lin's testimony appeared to be based on practiced script. And on cross-examination, the government gave up on an entire line of questioning about what happened aboard the smuggling vessel, because he was nonresponsive. The IJ agreed, stating that "[h]e is being nonresponsive." *Id.*

at 167.   Similarly, Lin could not remember anything about the federal court proceedings in which he pled guilty to illegally entering the United States.  As for his statements to immigration officials in Guam, he said that "everything was so – looked so dangerous.  I was so afraid, and I was so dizzy.  I was still reeling from the sea sickness." *Id*. at 172.  He also said that the sound of gunfire made it difficult to think straight.  Because he was forced by the smugglers to cook for his fellow passengers as punishment for a smoking infraction, he theorized they mistakenly identified him as a crew member.

Concerning events prior to Lin's departure from China, the government introduced evidence that on May 11, 1998, about two weeks before he fled the country, a residence registration card was filled out that listed his job as a farmer.  Separate family registrations were issued on the same date for his wife and daughter.  However, Lin denied coming out of hiding to register himself and his family, and said that his mother gave the government the information as part of a census.  Further, he could not provide the name of his schoolmate's father who arranged his departure – "I d[idn't] know his name.  I just call[ed] him uncle." *Id*. at 178.  Last, his explanation for why village officials allegedly corrected the date of his daughter's birth on the permit, but refused to correct the date on which the couple would be allowed to have a child, was the non-sequitur:  "Because they would calculate according to like from October, and then after the calculation, they put in the dates." *Id*. at 180.

THE IJ'S DECISION

The decision to deny the applications for relief was based on the IJ's determination that Lin was not credible. Among other things, the IJ found that:

● Smugglees typically pay the Snakeheads prior to leaving China – not after they arrive in the United States. Although the IJ noted that it was possible that the Snakeheads agreed to defer payment until they had successfully conveyed him to the United States, his experience in twelve years as an IJ is that "the Court has always heard that [the smugglees] have to come up with the money before they leave the country, so this is rather unusual." *Id*. at 82.

● State Department reports indicate that citizens in violation of family-planning policies can pay a fine. However, Lin decided that his family should pay the Snakeheads $15,000 – "a lot more than the penalty would be" – to get him out of China. The IJ called the decision to abandon his family instead of paying a fine "rather unusual, also." *Id*.

● Wen never mentioned the arrest of their parents or her sterilization procedure in any of her correspondence.

● During the hearing, Lin was cooperative and answered the questions posed by his lawyer, but on questioning by the government's lawyer, he was "evasive, . . . did not know the answer, [or] . . . never really would answer her questions directly." *Id*. at 83. "[T]hat bother[ed] the Court because it just seem[ed] like he was trying to hide something . . . ." *Id*.

● The Form I-213 said that "numerous people on the boat indicated that [Lin] was part of the crew, that he was carrying a club, that he would handcuff them, that he was an enforcer . . . ." *id.* at 84, and the IJ found that "he was part of the crew, and . . . an enforcer on that particular boat." *Id*. at 88.

● Lin initially told immigration officials that he left China "for economic reasons." *Id.*

● It was unusual that Lin was charged and convicted of illegal entry.

● Although Lin testified that he and wife were in hiding, just a few weeks before he fled China, he and his wife and daughter were listed on residence registration cards. And although he testified that village officials refused to register his daughter after her birth in 1996, he had no explanation for why they were willing to register her in 1998.

● The birth permit Lin presented at the hearing had been altered.

● Although Lin testified that he escaped from China to avoid its family-planning policies and allegedly had several pieces of documentation to support his claim, the IJ found it "rather suspicious that . . . he never told them about that when he was first picked up." *Id.* at 86.

"After a careful review of the record, the Court f[ound] that [Lin's] testimony was not sufficiently detailed, consistent, or believable to provide a plausible and coherent account of the basis for his fears, and thus [did] not [suffice] to establish his eligibility for asylum . . . ." *Id*. at 87. Further, because

-10-

he failed to meet the lesser burden of proof for asylum, his claim for restriction on removal necessarily failed.  The BIA dismissed his appeal "[f]or the reasons stated by the [IJ]."  *Id.* at 2.

## ANALYSIS

When the BIA summarily affirms an IJ's decision, we review the IJ's decision as the final agency determination.  *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004).  Our review is circumscribed by 8 U.S.C. § 1252(b)(4)(B), which provides, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  We also keep in mind that Lin has the burden to prove his claims.  8 U.S.C. §§ 1101(a)(42)(A) & 1231(b)(3); 8 C.F.R. §§ 208.13 & 208.16.  The consequence of that burden is the risk of nonpersuasion.[5]  "The burden of proof determines the risk of nonpersuasion.  Its significance is limited to those cases in which the trier of fact is left in doubt.  *McCormick on Evidence,* § 336 p. 947.  If the trier is in

___

[5]  At the risk of carrying coals to Newcastle, we discuss briefly the dual meaning of the term "burden of proof."  We note that "[t]he two distinct concepts [embodied in the term 'burden of proof'] may be referred to as (1) the risk of nonpersuasion, sometimes called the 'burden of persuasion,' and (2) the duty of producing evidence (or the burden of production), sometimes called the burden of going forward with the evidence." Fleming James, Jr. & Geoffrey C. Hazard, et al., Civil Procedure § 7.12 (5th ed. 2001). These two concepts can be distinguished by the fact that "[u]nlike the burden of persuasion, the burden of production can shift back and forth between parties during the trial." Larry L. Teply & Ralph U. Whitten, Civil Procedure 855 (2d ed. 2000). *Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003).

doubt, it must decide against the party bearing the burden of proof. *Id.*" *Fallon v. Illinois,* 882 F.2d 1206, 1217 (7th Cir. 1989).

In his petition for review, Lin concedes the IJ correctly stated the applicable law. The crux of his argument, instead, is that the IJ's adverse credibility determination is not supported by substantial evidence, and he erroneously relied on the Form I-213 report for his finding that Lin was part of the smuggling crew.

In most immigration cases, as here, an applicant's case depends almost entirely upon his credibility. If he is not credible he will be unable to sustain his burden of proof or the evidence may be in equipoise; in either event he loses. "Credibility determinations, like other findings of fact, are subject to the substantial evidence test. In particular, we have held that in order to determine that an alien is not a credible witness, the IJ must give specific, cogent reasons for disbelieving his or her testimony." *Diallo v. Gonzales*, 447 F.3d 1274, 1283 (10th Cir. 2006) (quotation and alteration omitted). "We may not weigh the evidence, and we will not question the [IJ's] . . . credibility determinations as long as they are substantially reasonable." *Woldemeskel v. INS*, 257 F.3d 1185, 1192 (10th Cir. 2001).

"An IJ's adverse credibility determination may appropriately be based upon such factors as inconsistencies in the witness' testimony, lack of sufficient detail,

or implausibility." *Elzour*, 378 F.3d at 1152.  Further, the "IJ may find a witness

not to be credible because of his or her testimonial demeanor." *Id*. at 1152-53.[6]

Clearly the IJ did not believe Lin.  There were multiple reasons, but in some

part it was because Lin's testimony was impeached by the Form I-213.  Lin

complains the Form I-213 was improperly admitted and considered because it

contained hearsay and, thus, deprived him of his right to a fair hearing.  Not so.

---

[6]     The REAL ID Act of 2005 includes new provisions relating to agency
credibility determinations:

> Considering the totality of the circumstances, and all relevant factors,
> a trier of fact may base a credibility determination on the demeanor,
> candor, or responsiveness of the applicant or witness, the inherent
> plausibility of the applicant's or witness's account, the consistency
> between the applicant's or witness's written and oral statements
> (whenever made and whether or not under oath, and considering the
> circumstances under which the statements were made), the internal
> consistency of each such statement, the consistency of such
> statements with other evidence of record (including the reports of the
> Department of State on country conditions), and any inaccuracies or
> falsehoods in such statements, without regard to whether an
> inconsistency, inaccuracy, or falsehood goes to the heart of the
> applicant's claim, or any other relevant factor.  There is no
> presumption of credibility, however, if no adverse credibility
> determination is explicitly made, the applicant or witness shall have
> a rebuttable presumption of credibility on appeal

8 U.S.C. § 1158(b)(1)(B)(iii).  *See also* 8 U.S.C. §§ 1229a(c)(4)(C), and
1231(b)(3)(C).  These provisions, however, only apply to aliens who applied for
asylum or other relief after May 11, 2005, the effective date of the Act.  *See* Pub.
L. No. 109-13, div. B § 101(h)(2), 119 Stat. 231, 305.  *See Yan v. Gonzales*,
438 F.3d 1249, 1251 n.3 (10th Cir. 2006).  Lin's hearing was held September 13,
2005; his application was filed before the effective date of the Real ID Act of
2005.

"[E]videntiary rules are not strictly applied at immigration hearings." *Bauge v. INS*, 7 F.3d 1540, 1543 (10th Cir. 1993). Instead, "[t]he test for admissibility of evidence in a deportation hearing is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Id.* (quotation omitted).

"A Form I-213 is an official record routinely prepared by an INS agent as a summary of information obtained at the time of the initial processing of an individual suspected of being an alien unlawfully present in the United States." *Id*. at 1543 n.2 (quotation omitted). This form is introduced at immigration proceedings so that the officer who prepared it rarely is required to attend. *See Felzcerek v. INS*, 75 F.3d 112, 117 (2nd Cir. 1996) (holding that a Form I-213 is presumptively reliable and can be admitted in deportation proceedings without calling the author as a witness, particularly when the alien has not presented any evidence to contradict or impeach the statements in the report).

Setting aside the fact that Lin offered no evidence of untrustworthiness or improper motive on the part of either the smugglees or the immigration officials, the information in the Form I-213 was probative because it contained important information about his alleged role as a crew member and enforcer and undercut his story that he was escaping from China at all. Further, its admission was not fundamentally unfair, because Lin was given the opportunity to explain his

activities aboard the vessel, but he was evasive and/or nonresponsive. Therefore, the Form I-213 constituted fundamentally fair and probative evidence that Lin did not adequately rebut, and the IJ did not err in relying on it.

We also reject Lin's next argument, which is that the government was required to produce the smugglees and/or the immigration officials at his hearing. He cites *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 682-83 (9th Cir. 2005), in support of this claim. Our consideration of this argument begins and ends with the fact that the hearsay affidavit in *Hernandez-Guadarrama* was the *only* evidence of the alien's smuggling activities – and the reason for his deportation. *Id.* at 681. These are not the facts of this case.

Third, Lin concedes that "the [IJ] provided additional reasons for finding [him] to be incredible." Pet'r Br. at 34. He argues, however, that the IJ's "analysis was heavily influenced by the . . . belief that [he] was a smuggling enforcer." *Id.* We disagree. In addition to the fact that the IJ's belief that Lin was a crew member is supported by substantial evidence, there is nothing in the record to establish that this belief was the touchstone of the decision. Instead, the IJ provided many additional reasons for his adverse credibility determination.

Lin's final argument is that the IJ's remaining credibility findings are not supported by specific, cogent reasons in the record, but instead are the product of speculation, conjecture, or unsupported personal opinion. Again, we disagree.

Although some of the findings do not find record support, the vast majority do. For example, the IJ found it implausible that Lin fled China to avoid its family-planning practices, but then told immigration officials that he left the country for economic reasons. He also doubted the credibility of Lin's family-planning concerns because he never mentioned this claim to immigration officials. Moreover, at least one of the documents submitted by Lin had been altered. Next, State Department reports indicate that citizens in violation of family-planning policies can pay a fine, R. at 292, however, Lin instead chose to abandon his wife and daughter, and left his relatives with a $15,000 bill to the Snakeheads. Last, Lin's demeanor during the hearing convinced the IJ that he was trying to hide something. Inferences to be drawn from demeanor are subject to many intangibles drawn from a face-to-face encounter, difficult to document or describe and rarely capable of being captured in a cold record. An IJ's evaluation of demeanor is not an apt subject for appellate second guessing. Deference is due to the fact finder both for practical reasons and as a testament to institutional trust. And while we accord great deference to the IJ's demeanor assessments, we find comfort in the confirming tattletales of record – the government's objections to leading questions and apparently scripted replies and Lin's non-responsive behavior on cross examination, his faulty memory, his confused and confusing answers, and his convenient explanations of prior conflicting testimony. In sum, the IJ's credibility determination is supported by substantial evidence of record

-16-

and detailed in specific, cogently stated reasons. We would be loath to say "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

We uphold the IJ's decision. The petition for review is DENIED.

Entered for the Court


Terrence L. O'Brien
Circuit Judge